147 F.3d 854
 127 Ed. Law Rep. 614, 98 Cal. Daily Op. Serv. 4277,
98 Daily Journal D.A.R. 6066
 Brian HO, by his parent and next friend, Carl HO; Patrick
Wong, by his parent and next friend, Charlene
Wong; Hilary Chen, by her parent and
next friend, Jane Chen,
Plaintiffs-Appellants,
v.
SAN FRANCISCO UNIFIED SCHOOL DISTRICT; San Francisco Board
of Education; Waldemar Rojas, Superintendent of the San
Francisco Unified School District; Board of Education of
the State of California; California Department of
Education; William D. Dawson; San Francisco National
Association for the Advancement of Colored People,
Defendants-Appellees.
Brian HO, by his parent and next friend, Carl HO, Petitioner,
v.
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, Respondent,
San Francisco Unified School District, Real Party In Interest.
 Nos. 97-15926, 97-70378.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 15, 1998.
Decided June 4, 1998.
 
 Daniel C. Girard, Girard & Greene, San Francisco, California, for appellants.
 Aubrey V. McCutcheon, Jr., Ypsilanti, Michigan, for appellee San Francisco Unified School District.
 John C. Yoo, Berkeley, California, for appellee Board of Education of the State of California.
 Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, California, for appellee Superintendent of the Board of Education.
 Haywood S. Gilliam, Jr., McCutchen, Doyle, Brown & Enerson, San Francisco, California, for appellee San Francisco Chapter of the NAACP.
 Appeals from the United States District Court For the Northern District of California; William H. Orrick, Jr., District Judge, Presiding. D.C. No. CV-94-02418-WHO.
 Before: NOONAN and TROTT, Circuit Judges, and WALLACH,* Judge.
 NOONAN, Circuit Judge:
 
 
 1
 By their parents and next friends, Brian Ho, aged 5, Patrick Wong, aged 14, and Hilary Chen, aged 8 (collectively Ho), brought this action in 1994 against the San Francisco Unified School District (the School District) and the other local and state defendants. The suit sought declaratory relief and an injunction forbidding the defendants from operating the public schools of San Francisco under a system of racial classification and quotas. Ho alleged that the defendants were violating the Fourteenth Amendment by adhering to paragraph 13 of a consent decree of fifty-five paragraphs approved by the district court in May 1983.
 
 
 2
 Paragraph 13, as modified by the court, reads in relevant part as follows:
 
 
 3
 "No school shall have fewer than four racial/ethnic groups represented in its student body. (b) No racial/ethnic group shall constitute more than 45% of the student enrollment at any regular school, nor more than 40% at any alternative school. In the event the percentage of any racial/ethnic group at any alternative school exceeds 40% after September 1983, the S.F.U.S.D. shall apply the provisions of subparagraph (c) to the entering class at such school. (c) Beginning with the 1983-84 school year, the S.F.U.S.D. shall monitor the entering classes of all regular schools in which a single racial/ethnic group comprises more than 45% of the student enrollment, to assure that students in that racial/ethnic group will not comprise more than 40% of the entering class at any such school." (emphasis in original).
 
 
 4
 The defendants moved to dismiss on the grounds of res judicata and collateral estoppel: all the issues, they maintained, had been decided in 1983. Observing that the suit relied on events that had occurred after 1983, the district court denied this motion.
 
 
 5
 On January 19, 1995, the court added as a defendant the San Francisco National Association for the Advancement of Colored People (SFNAACP), which had brought the suit that had led to the consent decree.
 
 
 6
 On March 8, 1996 the court certified the plaintiffs as representatives of a class consisting of "all children of Chinese descent of school age who are current residents of San Francisco and who are eligible to attend the public schools of the San Francisco Unified School District."
 
 
 7
 The case proceeded by answers to interrogatories and affidavits. Waldemar Rojas, general superintendent of the School District, filed an affidavit in which he swore as follows: "I have not assigned or authorized the assignment of students to schools in San Francisco based on their race or ethnicity. However, race or ethnicity is considered as a factor in determining whether the student population of a SFUSD school is within the guidelines set forth in Paragraph 13 of the Consent Decree and sometimes a student is not permitted to enroll if the school is overcrowded or outside the guideline. I have not been a part of any 'scheme of racial classification' I have not classified any student or parent of a SFUSD student as being of a particular race or ethnicity and I have not authorized any SFUSD staff member to classify a student as to the student's race or ethnicity. Parents or students may classify themselves for identification purposes."
 
 
 8
 Superintendent Rojas went on to declare: "All vestiges of past discriminatory or segregatory actions in the SFUSD have not been eliminated but I am committed to working toward such elimination in good faith.... Many vestiges of prior alleged segregatory acts remain in the SFUSD, but I believe our focused effort to implement our philosophical tenets and our specifically designed educational program as a part of the desegregation remedy will result in the district qualifying for a declaration of unitary status within a few years.... The level of confidence in public education by African-American, Latino, and persons of poverty remains minimal." (emphasis in original).
 
 
 9
 Superintendent Rojas's declaration then continued for a dozen pages principally devoted to the on-going program for the "reconstitution" of schools, that is, "a comprehensive ecological re-creation of a school community which places the students and parents of every race and ethnicity as institutional stakeholders of an educational facility and the reculturing of the institution through a new hiring process of all adult employees, including the custodians, teachers, paraprofessionals, offices aides, and the principal." (R. Doc. 102 at p 14).
 
 
 10
 Margaret G. Wells, Program Director at the Educational Placement Center of the School District, also provided a declaration under oath. She declared: "At some point, because of Paragraph 13 of the Consent Decree, it may become necessary to determine whether the race of the student is the same race as the student group which is the highest percentage in the entire school. We do not treat Paragraph 13 as a quota system. Race becomes a consideration only when placement of the student in the school will exceed 45% in the regular school or 40% in the alternative school.... If it is determined that the race of the student in a particular school is 45% or more, the parent/guardian is told about the desegregation court order and another school is sought."The Pre-Registration/Optional Enrollment Request information sheet provided to parents by the School District was attached to the Wells affidavit. The information sheet explains that Pre-Registration and Optional Enrollment Request forms must be submitted for all children who are new to the School District and for all children wishing to transfer out of their assigned school. The information sheet contains a section bearing the heading "RACIAL/ETHNIC DESIGNATION" followed by this statement: "The SFUSD accepts federal and private funds to provide better educational opportunities for students and to comply with the court-ordered Consent Decree. This requires that parent/guardians identify the racial/ethnic composition of students. Once the identification is made, the racial/ethnic designation will become a permanent entry on the student's school records. Parents/guardian may change the ethnicity only once and must include rationale and documentation to support the change.... The SFUSD reserves the right to deny such a change if the request cannot be substantiated." Another section is entitled "FALSIFICATION OF INFORMATION." It provides: "Under both federal and state law, any falsification of information provided to the District will constitute perjury, and will result in possible further legal action and cancellation of any transaction that involved the enrollment of a child."
 
 
 11
 The information sheet also reveals that even where attendance is not limited by a racial cap mandated by the consent decree, "Hispanic" and "African American" students are given priority over other, similarly situated, students in granting optional enrollment requests. The record indicates that the School District processes thousands of Pre-Registration and Optional Enrollment requests annually.
 
 
 12
 The accompanying form, Pre-Registration and Optional Enrollment Request, contains a section entitled "Racial/Ethnic Identification: CHECK ONLY ONE." The thirteen boxes of which only one may be checked are as follows: "African American; American Indian; Chinese; Filipino; Hispanic/Latino; Japanese; Korean; White; Arabic; Samoan; Southeast Asia (Cambodia, Laos, Thailand, Vietnam, etc.); Middle Easterner (Turkey, Iran, etc.); Other Non-White."
 
 
 13
 A third affidavit furnished by the defendants came from Steve Phillips, president of the School District's Board of Education. Phillips stated: "I am aware that all vestiges of the segregatory acts alleged by the San Francisco NAACP have not yet been eliminated 'root and branch' or 'to the greatest extent possible.' ... I know that there are presently many schools in which the goals set forth in paragraph 13 and paragraph 39-41 of the Consent Decree have not yet been achieved.... We have not yet reached the level of achievement that would permit us to validly claim that the victims of prior segregatory acts are convinced that we have fully complied with the terms of the Consent Decree and that all vestiges of segregation have been removed.... There is a very significant reservoir of distrust of the school district, based on a perception of unequal treatment. It is generally conceded that we must concentrate on improving the delivery of educational services to African-American and Latino students and to students who come from homes with low income.... Among the desegregation obligations referenced in the Consent Decree, which require our continued and focused attention are: (a) The over-representation of African-American males in Special Education; (b) Too many schools exceed Paragraph 13 guidelines; (c) Too many African-American and Latino students are in the bottom quantile in standardized achievement tests; (d) The grade point averages for African-American and Latino children are disproportionately low; and (e) The number of expulsions and suspensions of African-Americans, particularly males, is disproportionately high."
 
 
 14
 Aubrey V. McCutcheon, Jr., chief counsel for the School District in this case and in the case resulting in the consent decree, also gave an affidavit. Stating his familiarity with the consent decree and its implementation, McCutcheon declared: "[t]he Consent Decree has never been declared or used as authority for the SFUSD to classify students by race." McCutcheon added: "I have frequent contact with members of SFUSD parent and community groups. I am aware of the caution and, at times, distrust expressed by many residents of the District regarding the sincerity of the District's concern about commitment to the education of African-American and Latino students. I have attempted to work with SFUSD officials to demonstrate the good faith of the SFUSD but much is still to be done.... If Plaintiffs are successful in removing the constraints of the Consent Decree and Defendants are unable to establish lawful limits on the enrollments at any school, racial isolation and resegregation will swiftly occur.... [W]e acknowledge the need for further compliance efforts before seeking a declaration of unitary status."
 
 
 15
 The plaintiffs submitted SFUSD Desegregation Report No. 12, September 15, 1995 (Report), to the district court. The Report was prepared by "the monitoring partnership" of certain experts on education directed by the court to report to it. Although submitted by the plaintiffs, the defendants at oral argument pointed to parts of the report to sustain their case. Over $250,000,000 of public funds had been spent since 1983 on the implementation of the decree. (Report at 2.) The "major concern" identified by these observers of the implementation was the difficulty of holding anyone accountable--a problem illustrated by the use of the consent decree funds to reduce class size with no measurable improvement as a result of the expenditure. The report found that African American students were not being benefited by bilingual programs, and it found particularly disturbing the assignment--how often was not stated--of African Americans for disciplinary reasons to programs where the other language in use was Chinese. (Report at 35.) African American and Hispanic students were found to be underrepresented in mathematics, computer studies, and science in high schools. (Report at 64.) There was "great pressure" on teachers "not to refer African American and Hispanic males to Special Education," (Report at 67), but nonetheless there were "disproportionate numbers" of African Americans in Special Education. (Report at 64.) African Americans and Hispanics scored poorly on tests of reading, writing, and mathematics. (Report at 92.) Busing from their home neighborhoods to schools in other areas had not "achieved academic gains for Hispanic and African American youngsters." (Report at 73.) A good deal of voluntary segregation by peer groups within schools was observed. (Report at 17, 64, 72-73.) Consent decree funding was still regarded at many schools "as a means of remediation, thus perpetuating the notion that students of certain ethnicities are incapable of academic achievement." (Report at 56.)
 
 
 16
 On the plaintiffs' motion for summary judgment, the district court noted that the constitutionality of the consent decree at the time of its entry was res judicata; the plaintiffs were bound because the SFNAACP had been certified as the representative of all San Francisco schoolchildren. The court then addressed "the more difficult" question of present constitutionality. The court stated: "At the outset, plaintiffs have shown that they are subject to race-based classification by a state actor. Despite defendants' claim that students engage in self-identification, and that the SFUSD does not engage in classification by race, there can be no genuine dispute of fact on this point."
 
 
 17
 The court then held that it was the burden of the defendants "to provide a justification for the scheme." The court went on to say, "This shift in the burden of proof occurs at trial; however, it does not relieve plaintiffs of their burden, as moving parties on summary judgment, of demonstrating the absence of disputes of material fact on key issues." (emphasis in original).
 
 
 18
 The court turned to a discussion of whether plaintiffs had made this demonstration. The court assumed that the plaintiffs had to demonstrate that there had been no racial segregation by the School District that required racial classification as a remedy and to show that the consent decree remedy was not "narrowly-tailored" to the racial evil that existed. On the first point the court stated: "the degree to which the SFUSD engaged in intentional segregation prior to the institution of the Consent Decree is a factual issue no less contested now than it was then." The court made no findings as to disputed facts involving current segregation or involving vestiges of past discrimination. As to whether the challenged paragraph of the consent decree was narrowly tailored, the court observed that the plaintiffs claimed that paragraph 13 constituted an unconstitutional racial balancing scheme. The court did not respond to this argument but, citing Davis v. City & County of San Francisco, 890 F.2d 1438, 1447 (9th Cir.1989), merely stated: "plaintiffs fail to show the absence of a dispute of fact relating to the 'necessity for the relief; efficacy of alternative remedies; flexibility and duration of the relief; waiver provisions; relationship of any numerical goals to the relevant [population]; and impact of relief on third parties.' " The plaintiffs' motion was denied and the case set down for trial.
 
 
 19
 The plaintiffs appeal. They are joined in the appeal by the Board of Education of the State of California, a named defendant which has voted to change position and to ally itself with the plaintiffs. The plaintiffs also seek a writ of mandamus.
 
 ANALYSIS
 
 20
 Jurisdiction. In their brief filed on appeal, the defendants challenge our jurisdiction, citing the teaching of Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966) that denial of summary judgment, not being a final judgment, is not appealable. The plaintiffs counter with Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), where the Supreme Court noted that Congress had modified the "rigid application" of the rule against piecemeal appeals by creating an exception for appeals as of right from interlocutory orders of the district court "granting, continuing, modifying, refusing, or dissolving, injunctions." Carson, 450 U.S. at 83, 101 S.Ct. 993, quoting 28 U.S.C. § 1292(a)(1). The Court noted that while the refusal to enter a consent decree did not in terms refuse an injunction, "it nonetheless had the practical effect of doing so." Id.
 
 
 21
 The Supreme Court distinguished Switzerland Cheese in this way:
 
 
 22
 Although the District Court order [in Switzerland Cheese ] seemed to fit within the statutory language of § 1292(a)(1), petitioners' contention was rejected because they did not show that the order might cause them irreparable consequences if not immediately reviewed. The motion for summary judgment sought permanent and not preliminary injunctive relief and petitioners did not argue that a denial of summary judgment would cause them irreparable harm pendente lite. Since permanent injunctive relief might have been obtained after trial, the interlocutory order lacked the "serious, perhaps irreparable, consequence" that is a prerequisite to appealability under § 1292(a)(1).
 
 
 23
 Id. at 85, 101 S.Ct. 993.
 
 
 24
 The Court added that, in distinction from Switzerland Cheese, in Carson,
 
 
 25
 in seeking entry of the proposed consent decree, petitioners sought an immediate restructuring of respondents' transfer and promotional policies. They asserted in their complaint that they would suffer irreparable injury unless they obtained that injunctive relief at the earliest opportunity. Because petitioners cannot obtain that relief until the proposed consent decree is entered, any further delay in reviewing the propriety of the District Court's refusal to enter the decree might cause them serious or irreparable harm.
 
 
 26
 Id. at 89, 101 S.Ct. 993.
 
 
 27
 In our case the order of the court fits within the statutory language of § 1292(a)(1). It is an order continuing the injunction enforcing the consent decree. Unlike the Switzerland Cheese petitioners, the plaintiffs here allege irreparable injuries--the injury of being classified by race, the injury of being subject to a racial quota in seeking schooling, and the loss of an entire school year.
 
 
 28
 The difficulty is the teaching of the Supreme Court that "[p]roper resolution of any desegregation case turns on a careful assessment of its facts." Freeman v. Pitts, 503 U.S. 467, 474, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (emphasis added). We are supplied on this appeal with facts provided by affidavits and reports to the district court. We are not supplied with facts found by the district court. Our normal way of adjudication is first the facts, then the decision of the district court, then the appeal. In a case where facts are critical, we cannot change this order of business. We are without jurisdiction to rule on the plaintiffs' appeal.
 
 
 29
 The Petition for Mandamus. The plaintiffs have also asked us to direct the district court not to proceed with the trial it has scheduled to begin September 22, 1998. We review this petition under the usual Bauman factors. Bauman v. United States District Court, 557 F.2d 650, 654-55 (9th Cir.1977).
 
 
 30
 The nub of the plaintiffs' position is that the district court is proceeding to trial where there is no need for a trial; the plaintiffs' fall-back position is that the district court has misconceived the burden of proof at trial. Either of these alleged errors implicates Bauman factors. We discuss them in turn.
 
 
 31
 The Issue No Longer In Dispute: The School District's Use of Racial Classification and Racial Quotas.
 
 
 32
 The plaintiffs alleged that the School District operates a system of racial classification and racial quotas and pointed to paragraph 13 of the consent decree as authorizing and requiring such classification and quotas. The defendants filed affidavits denying the truth of the plaintiffs' claims. Superintendent of Schools Rojas stated that he had not assigned or authorized the assignment of students "based on their race or ethnicity." Chief Counsel McCutcheon, noting his familiarity with the consent decree and his long involvement in the case, stated that the decree "has never been declared or used as authority for the SFUSD to classify students by race."
 
 
 33
 In oral argument on appeal the following dialogue occurred:
 
 
 34
 THE COURT:Will you tell me what race means?
 
 
 35
 COUNSEL:I wish I knew.
 
 
 36
 THE COURT:All right. Thank you.
 
 
 37
 COUNSEL:I wish I knew what the plaintiffs said it means.
 
 
 38
 THE COURT:Are you conceding that for the purposes of your client that they do not know what race means?
 
 
 39
 COUNSEL:I'm saying I don't know what race means.
 
 
 40
 THE COURT:You're representing the school district.
 
 
 41
 COUNSEL:Yes.
 
 
 42
 THE COURT:Does the school district know what race means?
 
 
 43
 COUNSEL:I don't believe they do. I don't believe that they know more than I do.
 
 
 44
 THE COURT:Well, can you say what their position is on race? Are you conceding they don't know what race is?
 
 
 45
 COUNSEL:I have not attempted to establish for the entire school district what the various viewpoints of the people involved in the school district....
 
 
 46
 THE COURT:This is the main issue. Will the school district give up its racial forms so that no one has to identify themselves? Will they give it up?
 
 
 47
 COUNSEL:If Judge Orrick demands that we do so.
 
 
 48
 THE COURT:No, I'm asking you now.
 
 
 49
 COUNSEL: ... But the law does not require that.
 
 
 50
 THE COURT:On this appeal, will you say that you will no longer ...
 
 
 51
 COUNSEL:Absolutely not.
 
 
 52
 THE COURT:All right. Thank you. But you don't know what it is?
 
 
 53
 COUNSEL:But because I don't know what it is, I don't know what I'm giving up if I say to you, "Yes, I will give it up."
 
 
 54
 Margaret Wells, the officer of the School District in charge of student placement, presented a different picture in her affidavit and the documents accompanying it. According to her, race did not enter into school admission, unless the race of the student in a particular school "will exceed 45% in the regular school or 40% in the alternative school." If that happened, "another school is sought"--this delicate passive being employed to gloss over the compulsion exercised by the School District to force the seeking of another school. The accompanying forms left no doubt about the School District's intent and effort to enforce racial classification and quotas. Parents or guardians were required to check off one box among thirteen "racial/ethnic" categories. They were not given the option of refusal. They were not given the choice of more than one category. They were compelled to classify their children by the racial/ethnic categories chosen by the School District. They were informed--without citation of any authority--that any falsification of this information "will constitute perjury" under both state and federal law. They were told that they might change the designation only once and then only by providing "rationale and documentation to support the change," with the necessary implication that the School District would review the rationale and documentation to determine if the change was justified.
 
 
 55
 The form in use by the School District carries the title of Pre-Registration/Optional Enrollment Request Information. In a school population of 63,000 children, thousands of requests are processed annually. The use of the form can scarcely be seen as optional when so many children find it necessary to use it. Under the terms of the consent decree itself, a racial cap descends on any school where more than 45% of the student body belongs to "a single/racial ethnic group." The School District has the obligation to "monitor" the schools to rectify such situations by imposing a racial cap on admissions to that school. The cap and the racial identification necessary to enforce it cannot reasonably be described as optional or voluntary.
 
 
 56
 A conflict of material fact existed between the Rojas and McCutcheon affidavits on the one hand and the Wells affidavit on the other. A defendant cannot create a triable issue of fact by submitting conflicting evidence. The district court properly resolved the conflict within the defendants' affidavits by ruling that there was no dispute as to what was going on: the plaintiffs were "subject to race-based classification by a state actor." If that were the only issue in dispute, a trial would be unnecessary, and the plaintiffs would be entitled to judgment as a matter of law. It is, however, not the only issue.
 
 
 57
 The Use of Race by Government. The use of race by government is, in general, highly disfavored by the law. The reasons are these:
 
 
 58
 First. Race has regularly been used as a way of oppressing, persecuting, or discriminating against a group of persons on the basis of alleged color or some other accidental physical attribute. In America, from its colonial beginnings, hostility to Native Americans was justified by race and race was specified by color. The servitude of African Americans was justified by race with attention primarily to color. See Thomas Jefferson, Notes on the State of Virginia, Query XIV, "Laws", 138-40 (William Peden ed. Univ. of North Carolina Press 1982) (1787).
 
 
 59
 In the now notorious decision of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the Supreme Court of the United States, 8 to 1, upheld the criminal prosecution of a person alleged to be of "the colored race" for entering a railroad car designated for "the white race." The Court declared the distinction was "founded in the color of the two races," Id. at 543, 16 S.Ct. 1138, and then equated "color" with varying proportions of "colored blood." Id. at 552, 16 S.Ct. 1138. In vain the lone dissenter, Justice Harlan, contended that the enactment of the Thirteenth, Fourteenth, and Fifteenth Amendments "had removed the race line from our governmental systems." Id. at 555, 16 S.Ct. 1138.
 
 
 60
 Instead, the race line, given sanction by the Supreme Court, flourished in segregated transportation, segregated drinking fountains and toilets, and in segregated schools. The last were upheld by a unanimous Supreme Court as constitutional in the exclusion of a girl of Chinese ancestry born in the United States whose entry into a "white" or "Caucasian" school was opposed by the school authorities on the ground that she was "of the Mongolian or yellow race" and so eligible only to enter a school for "colored" children. Gong Lum v. Rice, 275 U.S. 78, 80-81, 87, 48 S.Ct. 91, 72 L.Ed. 172 (1927).
 
 
 61
 It is less than half a century ago that this governmental use of race as an instrument of discrimination was finally repudiated. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Misuse of race by government for over three centuries in America must make any new governmental use of race stand suspect and in pressing need of justification.
 
 
 62
 Second. Race got its standing in the nineteenth century by pseudo-science. In the name of that science the "Anglo-Saxon race" was glorified, and immigration to America diluting "the Anglo-Saxon heritage" was viewed with alarm. In the name of that science the "yellow peril" of immigration from Asia was decried--a tradition of the hateful rhetoric of color continued in by California officialdom as late as the 1920 report for Governor Stephens entitled California and the Oriental. See Charles J. McClain, In Search of Equality 283 (1994). In the name of that science, persons were assigned to biological groupings that were perceived as superior or as degenerate. See Ian F. Haney Lopez, White by Law 27-33 (1996).
 
 
 63
 Now it is scientifically accepted that races "are not, and never were, groups clearly defined biologically." See William W. Howells, The Meaning of Race in The Biological and Social Meaning of Race 16 (Richard H. Osborne ed.1971). The use of the alleged color differences demonstrates "the social rather than scientific origins of race." Ian F. Haney Lopez, The Social Construction of Race: Some Observations on Illusion, Fabrication, and Choice, 29 Harv. C.R.-C.L. L. Rev. 1, 13 (1994).
 
 
 64
 That race is a social construct does not mean, of course, that the concept of it does not affect the way reality is sometimes perceived. Sometimes the concept has been invoked to instill pride into an immigrant or discriminated-against group. As Brandeis once put it with his usual exactness and penetration: "The new nationalism adopted by America proclaims that each race or people, like each individual, has the right and duty to develop, and that only through such differentiated development will high civilization be attained." Speech by Louis D. Brandeis (July 4, 1915), quoted in Hillel Levin & Lawrence Harmon, The Death of an American Jewish Community 48 (1992). It is one thing, however, for a group to emphasize voluntarily the features that make it cohesive and confident and an entirely other thing for government to require racial self-designation and impose governmental sanctions for failure to do so and add further sanctions as the consequence of doing so.
 
 
 65
 Third. A long history of governmental discrimination based on race has marked the governmental treatment of persons of Chinese descent in California and in particular in San Francisco. Every law student knows of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), where the Supreme Court invalidated an ordinance of the City of San Francisco that was applied in discriminatory fashion against Chinese laundrymen. Yick Wo is only "the small tip of a very large iceberg" of Sinophobic legal measures and spirited resistance to them. See McClain, supra, at 3.
 
 
 66
 Of especial note was the City of San Francisco's ordinance removing the Chinese population of the city from their homes and confining them to an area set aside for slaughterhouses and other businesses thought prejudicial to public health or comfort. Id. 224. This kind of legislation has been aptly termed "racism's ultimate expression." Id. 231, quoting Benno Schmidt, Principle and Prejudice: The Supreme Court and Race Relations in the Progressive Era. Part 1: The Heyday of Jim Crow, 82 Colum. L.Rev. 500 (1982). The ordinance was vigorously defended in court by the City of San Francisco with pleading described as "undoubtedly one of the more appalling statements of racial bigotry in Western legal history." McClain, supra, at 229. The ordinance was invalidated by the federal circuit court. In re Lee Sing, 43 F. 359 (C.C.N.D.Cal.1890).
 
 
 67
 The effort of children of Chinese descent to gain admission to any public school in San Francisco has an even longer and more painful history. See McClain, supra, at 133-144. California schools were open only to "white" children as late as the 1870s when there were over 2,000 children of Chinese ancestry living in the state. In 1884 Mamie Tape, the eight-year old daughter of an American woman and an immigrant from China, sought admission to a San Francisco public school. The State Superintendent of Public Instruction advised the San Francisco School Superintendent that the public schools were not open to such "Mongolian children." Id. at 137. Mamie Tape sued and won in the California Supreme Court. Tape v. Hurley, 66 Cal. 473, 6 P. 129 (1885). The school officials promptly lobbied the legislature to authorize separate schools for children "of Mongolian or Chinese descent." McClain, supra, at 142. The state education law was amended to this effect, with the proviso that such children "must not be admitted to any other school." 1885 Cal. Stat. 99-100. The law was not repealed until 1947. See 1947 Cal. Stat. 1792 1. Given such a history of official bias in the public school system of San Francisco, it is specially hazardous to adopt racial classifications and racial caps that bear most heavily upon the class of plaintiff schoolchildren.
 
 
 68
 Fourth. Race identifies groups. The legal rights of Americans are personal. Our rights belong to each of us as individual persons. Our rights are not conferred upon us as members of any group or as a corollary of any racial identification.
 
 
 69
 In the course of his famous argument in 1841 before the Supreme Court in behalf of the Africans of the Amistad, John Quincy Adams asked a question to which he thought only a negative answer could be given: "Is it possible that a President of the United States should be ignorant that the right of personal liberty is individual?" John Quincy Adams, Argument in the Case of the United States v. Cinque 82 (Negro Universities Press 1968) (1841). Twenty-seven years later the same vital focus on the person was made part of the Constitution: "... nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.
 
 
 70
 It is as a person that each of us has these rights that are so majestically secured. The rights created by the Fourteenth Amendment are "guaranteed to the individual. The rights established are personal rights." Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). It follows "that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).
 
 
 71
 As the last quotation implies, the Supreme Court has not banished race altogether from our governmental systems. The concept, so long the instrument of governmental evil, so fraudulently promoted by pseudo-science, so corrosive of the rights of the person, may still be employed if its use is found to be necessary as the way of repairing injuries inflicted on persons because of race. Freeman, 503 U.S. at 494, 112 S.Ct. 1430. Deployed for that limited purpose, race functions as a kind of surrogate for the persons who have actually been damaged by the use of race. It is not a group surrogate in such a way that earlier harm to a group is to be compensated for by advantaging the group's descendents. If such a system of group surrogation prevailed, the Chinese schoolchildren of San Francisco would have an excellent case for preferences compensating for earlier wrongs. But the temporary expedient of using race is to compensate individual persons themselves injured by the malevolent use of race. This employment of race may be compared to the building of a back fire as a means of containing a conflagration. Skillfully done, carefully controlled, the back fire will work to extinguish the greater blaze and not function to increase the devastation. The comparison suggests how tight a hand must be kept on race lest, employing it to remedy racial evil, it slip out of control and inflict fresh harm.
 
 
 72
 In the face of the scientific and practical difficulties of classification and the horrible history of the term, it is not altogether surprising that counsel for the School District should declare that neither he nor his client can explain what "race" means. Yet how can a system that in fact does use racial classifications and quotas work rationally without knowing what the central classifying concept means? The question points to the difficulty of the defendants' position. Nonetheless, issues remain for trial.
 
 
 73
 The Issues For Trial. As race may permissibly be used by government in the very limited way described, two issues remain for trial: Do vestiges remain of the racism that justified paragraph 13 of the consent decree in 1983? Is paragraph 13 necessary to remove the vestiges if they do remain?
 
 
 74
 The district court properly ruled that the consent decree of 1983 was res judicata binding the plaintiffs as to the decree's propriety in 1983, while leaving open the question of the propriety of paragraph 13 today. The School District's affidavits assert that vestiges of segregation do remain. Information on this point is peculiarly within the knowledge and control of the School District. It will be incumbent on it at trial to produce evidence more concrete than the conclusory statements in its affidavits. The "vestiges" to be proved by it must be tied to the discriminating practices and policies that justified the consent decree fifteen years ago.
 
 
 75
 It will also be the task of the School District to demonstrate that paragraph 13 is still a remedy fitted to a wrong--to show that the racial classifications and quotas employed by paragraph 13 are tailored to the problems caused by vestiges of the earlier segregation. Racial balancing cannot be the objective of a federal court unless the balancing is shown to be necessary to correct the effects of government action of a racist character. Freeman, 503 U.S. at 494, 112 S.Ct. 1430.
 
 
 76
 Freeman was a case where a school district, which had agreed to a consent decree ending de jure segregation, sought to emerge from under the decree, contending that the dual school system had ended and that the district had achieved "unitary status." Id. at 471, 112 S.Ct. 1430. Consequently, the district had "the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." Id. at 494, 112 S.Ct. 1430.
 
 
 77
 When a governmental body is defending racial quotas, the burden of justification falls on the government. A "generalized assertion" of past discrimination and present effects does not meet that burden. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 498, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The mere recitation of a remedial purpose "is entitled to little or no weight." Id. at 500, 109 S.Ct. 706. Racial classifications are suspect and that means that assurances of good intentions "cannot suffice." Id.
 
 
 78
 Once the plaintiffs established the School District's use of racial classifications--and that use has properly been found to be uncontested--the School District has the duty to justify them. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). The perilous undertaking of employing race as a remedy must be justified by the defendants as alleviating a violation of the Constitution. Freeman, 503 U.S. at 489, 112 S.Ct. 1430. At trial, the School District will bear the burden of proving that Paragraph 13 of the Consent Decree is a "narrowly tailored measure[ ] that further[s] compelling government interests." Adarand, 515 U.S. at 227, 115 S.Ct. 2097.
 
 
 79
 From this discussion it emerges that the district court is not in error in scheduling a trial that will promptly address the plaintiffs' case. We have less reason to intervene with the district court's schedule as this case comes to us at the end of the school year when the School District will have already made fall assignments under paragraph 13. If the plaintiffs are correct, their injury is irreparable, but even irreparable constitutional injury need be remedied only as rapidly as practicable. Brown v. Board of Education, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Trial and judgment in the fall gives the School District sufficient time to make adjustments, if they should be required, for the school year 1999-2000. Intervention by this court could not provide a more accelerated timetable.
 
 
 80
 The appeal is DISMISSED. The petition for mandamus is DENIED.
 
 WALLACH, Judge, dissenting:
 
 81
 While I concur in most of this excellently reasoned opinion, I must, respectfully, dissent regarding the majority's finding that we lack jurisdiction to hear an appeal from denial of a Fed.R.Civ.P. 56 motion for summary judgment because of the fact intensive nature of desegregation cases. The majority states:
 
 
 82
 We are supplied on this appeal with facts provided by affidavits and reports to the district court. We are not supplied with facts found by the district court. Our normal way of adjudication is first the facts, then the decision of the district court, then the appeal. In a case where the facts are critical, we cannot change this order of business.
 
 
 83
 Rule 56(c), however, entitles a moving party to a summary judgment, whenever "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
 
 
 84
 Rule 56(e) requires that an affidavit opposing a motion for summary judgment "... shall set forth such facts as would be admissible in evidence." Those facts must be admissible under the rules governing admission of evidence. Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir.1989).
 
 
 85
 To survive summary judgment, the nonmoving party must produce evidence of sufficient caliber or quantity to allow a rational trier of fact to produce a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine factual issue exists for trial where a nonmoving party rests on mere allegations or denials, or shows "some metaphysical doubt." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 86
 Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.
 
 
 87
 Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). (Emphasis added).
 
 
 88
 The majority identifies only two issues remaining for trial, viz., 1) whether there still exist vestiges of the racism which justified paragraph 13 of the consent decree, and 2) whether that paragraph is necessary to remove any remaining vestiges. If such vestiges do not still exist then the second issue is moot.
 
 The majority notes, however, that:
 
 89
 The School District's affidavits assert that vestiges of segregation do remain. Information on this point is particularly within the knowledge and control of the School District. It will be incumbent upon it at trial to produce evidence more concrete than the conclusory statements in its affidavits.
 
 
 90
 I dissent because I believe the majority is correct in its evidentiary analysis. The School District's statements in the Affidavits it provided in opposition to Appellees' Motion were conclusory on this key remaining issue. As a result neither the trial judge nor we had before us any genuinely contested facts sufficient either to create a genuine issue, or to deprive an appellate court of jurisdiction.
 
 
 91
 Accordingly, because I agree with the rest of the majority's analysis, I believe the trial court's denial of summary judgment must be reversed.
 
 
 
 *
 Honorable Evan J. Wallach, Judge, U.S. Court of International Trade, sitting by designation