**16-343**
*In re Tronox Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2016

(Argued: November 16, 2016    Decided: April 20, 2017)

Docket No. 16-343

IN RE TRONOX INC.

TRONOX INC., TRONOX WORLDWIDE LLC, F/K/A KERR-MCGEE
CHEMICAL WORLDWIDE LLC, TRONOX LLC, THE ANADARKO
LITIGATION TRUST,

*Plaintiffs*,

UNITED STATES OF AMERICA,

*Intervenor Plaintiff*,

AVOCA PLAINTIFFS,

*Respondents-Appellants*,

v.

KERR-MCGEE CORP.,

*Defendant-Appellee*,

KERR-MCGEE OIL & GAS CORP., KERR-MCGEE WORLDWIDE CORP., KERR-MCGEE INVESTMENT CORP., KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, KERR-MCGEE STORED POWER COMPANY LLC, ANADARKO PETROLEUM CORP.,

*Defendants.*[*]

_____

Before:

KEARSE, WESLEY, and DRONEY, *Circuit Judges*.

Appeal from a February 1, 2016 decision of the United States District Court for the Southern District of New York (Forrest, *J.*) granting the motion of Defendant-Appellee Kerr-McGee Corporation and ordering Respondents-Appellants Avoca Plaintiffs to dismiss with prejudice their actions in Pennsylvania state court because their claims were derivative and duplicative of claims that were part of a $5.15 billion bankruptcy settlement and therefore barred by the post-settlement, permanent anti-suit injunction. Appellants challenge the merits of the District Court's ruling and contend that it is appealable as a final order under 28 U.S.C. § 1291 or 28 U.S.C. § 158(d), or as a modification or continuation of an injunction under 28 U.S.C. § 1292(a)(1). We hold that the order is not "final"

[*] The Clerk of Court is respectfully directed to amend the official caption to conform to the caption above.

2

because it neither found contempt nor imposed sanctions as required by § 1291, nor was it a decision by the District Court on review of a bankruptcy court order as required by § 158(d). We further hold that the District Court did not modify or continue the injunction for purposes of § 1292(a)(1). Because neither those nor any other bases for jurisdiction are present, we **DISMISS** the appeal for lack of jurisdiction.

————————

LUKE A. MCGRATH, Dunnington, Bartholow & Miller LLP, New York, NY (Alani Golanski, Jerry Kristal, Weitz & Luxenberg, P.C., New York, NY, *on the brief*), *for Respondents-Appellants*.

BRYAN M. KILLIAN, Morgan, Lewis & Bockius LLP, Washington, DC (Kenneth N. Klee, David M. Stern, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, CA; Thomas R. Lotterman, Duke K. McCall, III, Morgan, Lewis & Bockius LLP, Washington, DC, *on the brief*), *for Defendant-Appellee.*

————————

WESLEY, *Circuit Judge*:

This is an appeal from an order of the U.S. District Court for the Southern District of New York (Forrest, *J.*) enforcing a permanent anti-suit injunction issued after a bankruptcy settlement. The tortured corporate histories and shifting legal theories involved make it a messy case to

distill. At its core, it is about more than 4,300 individuals (the "Avoca Plaintiffs") who allege significant injuries from the operation of a wood-treatment plant in Avoca, Pennsylvania (the "Avoca Plant") between 1956 and 1996. They originally brought their toxic-tort claims in Pennsylvania state court (the "PA State Action") against several entities including Kerr-McGee Corporation ("New Kerr-McGee"), but their suits were stayed when two of those entities, the owners/operators of the Avoca Plant (the "Tronox debtors" or "the debtors"), filed for bankruptcy in the Southern District of New York. The bankruptcy proceeding revealed a series of corporate transformations that ultimately yielded New Kerr-McGee. After the spinoff, New Kerr-McGee maintained control of the more lucrative oil and gas businesses and left the Tronox debtors with the immense environmental and tort liabilities arising from the previous operation of the Avoca Plant. These transactions were, as the bankruptcy court concluded, essentially fraudulent conveyances designed to place assets beyond the reach of the Tronox entities' creditors.

In the course of the bankruptcy proceeding, the Tronox debtors instituted an adversary proceeding against New Kerr-McGee for fraudulent conveyance to recover assets that would satisfy the debtors' liabilities. Ultimately, New Kerr-McGee settled with the Tronox debtors for over $5 billion; of that sum, more than $600 million was designated for beneficiaries of the Tort Claims Trust, including the Avoca Plaintiffs. New Kerr-McGee sought peace with that payment and required as part of the settlement that the District Court—the court tasked with

4

approving the bankruptcy settlement—would issue an injunction barring the litigation of claims that are derivative or duplicative of the Tronox debtors' claims against New Kerr-McGee (the "Injunction").

After the District Court approved the settlement and issued the Injunction, the Avoca Plaintiffs sought to revive their toxic-tort claims in Pennsylvania state court, again naming New Kerr-McGee as a defendant. The Avoca Plaintiffs did not, however, alter their state-court complaint to allege direct claims against New Kerr-McGee to hold it responsible for its own alleged wrongdoing. Instead, they advanced indirect alter-ego and veil-piercing theories to hold New Kerr-McGee responsible for the conduct of the Tronox debtors. New Kerr-McGee moved in the District Court for an order enforcing the Injunction and for sanctions, asserting that the Injunction forecloses claims that arise from liabilities derived from or through the Tronox debtors that are also generalized and common to all creditors.

The District Court concluded that the claims are barred by the Injunction and, without imposing sanctions or finding contempt, ordered the Avoca Plaintiffs to dismiss with prejudice their state-court complaints. The Avoca Plaintiffs appealed and sought a stay pending appeal, which we granted.

The Avoca Plaintiffs assert three bases for appellate jurisdiction—28 U.S.C. §§ 1291, 158(d), and 1292(a)(1)—none of which persuade us. First, the District Court's order is not "final" for purposes of 28 U.S.C. § 1291, because it

neither found contempt nor imposed sanctions. Second, the order is not a decision by the District Court on review of a bankruptcy court order, as required by § 158(d). Third, after an appropriate, under the circumstances, discussion of the merits, we conclude that we lack jurisdiction under § 1292(a)(1) because the District Court properly construed (and neither modified nor continued) the Injunction. In confirming the District Court's construction of the Injunction, we hold that the Avoca Plaintiffs' personal injury claims based on conduct of the Tronox debtors, and asserted against New Kerr-McGee on a variety of state-law indirect-liability theories, are generalized "derivative" claims that fall within the property of the bankruptcy estate. Accordingly, we lift the stay and **DISMISS** the appeal for lack of jurisdiction.

## BACKGROUND[1]

### I. CORPORATE HISTORY OF THE RELEVANT ENTITIES

Critical to the District Court's decision below and ours here is the role and relationship of the relevant

---

[1] Unless otherwise noted, these undisputed facts are taken from the District Court's recitation. The District Court relied on the Master Complaint (described *infra*), the Avoca Plaintiffs' motion to restore jurisdiction in Pennsylvania state court, and the "Amended Joint Fact Stipulations of the Parties" filed in Tronox's adversary proceeding against New Kerr-McGee as well as the bankruptcy court's trial decision, both of which the Avoca Plaintiffs accepted as true for purposes of the District Court's resolution of New Kerr-McGee's enforcement motion.

defendants in the PA State Action—"Kerr-McGee Chemical," "Old Kerr-McGee," and "New Kerr-McGee"—and the allegations against them. It gets confusing because both Old Kerr-McGee and New Kerr-McGee, at different times, have operated under the name "Kerr-McGee Corporation." The critical takeaway is that Kerr-McGee Chemical,[2] the previous operator of the Avoca Plant, and its former parent, Old Kerr-McGee,[3] ultimately became the Tronox debtors (Tronox LLC and Tronox Worldwide LLC, respectively). New Kerr-McGee,[4] a later corporate spinoff of Kerr-McGee Chemical and Old Kerr-McGee, did not exist until 2001 and was not a Tronox debtor.[5]

---

[2] From 1956 until 1996, "Kerr-McGee Chemical Corporation" (herein referred to as "Kerr-McGee Chemical") and its predecessors owned and operated the Avoca Plant. Kerr-McGee Chemical was later renamed "Tronox LLC," after being transferred to Tronox Incorporated.

[3] Kerr-McGee Chemical's parent was called "Kerr-McGee Corporation" (herein referred to as "Old Kerr-McGee") until 2001, when it was renamed "Kerr-McGee Operating Corporation." After being transferred to Tronox Incorporated, the parent was ultimately renamed "Tronox Worldwide LLC."

[4] The former indirect parent of Kerr-McGee Chemical and Old Kerr-McGee, referred to herein as "New Kerr-McGee," was created in 2001. New Kerr-McGee was briefly known was "Kerr-McGee Holdco, Inc." and has ever since been known as "Kerr-McGee Corporation."

[5] To assist the reader, we reproduce at Appendix A the helpful chart—prepared by New Kerr-McGee and relied upon by the

The reason for the confusing history of corporate restructurings and name changes is that, starting in 2002, New Kerr-McGee began to sever its chemical business—which included the Avoca Plant and was riddled with legacy tort and environmental liabilities—from its more profitable oil and gas business. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox)*, 503 B.R. 239, 252-55, 259, 266 (Bankr. S.D.N.Y. 2013). Upon completion of the spinoff in 2006, New Kerr-McGee was separated from the Tronox entities, including what were formerly Kerr-McGee Chemical and Old Kerr-McGee. This spinoff in essence allocated substantially all of the former companies' valuable assets to New Kerr-McGee and substantially all of the companies' costly liabilities to the Tronox debtors, which the debtors claimed left them severely undercapitalized and became the basis of their fraudulent-conveyance claims in the adversary proceeding against New Kerr-McGee in the bankruptcy. *Id.* More on that later.

## II. THE PA STATE ACTION

In 2005, the Avoca Plaintiffs sued Kerr-McGee Chemical, Old Kerr-McGee, and New Kerr-McGee[6] in

District Court—showing the undisputed history and roles of the various entities.

[6] The Avoca Plaintiffs also named Kerr-McGee Holdco, Inc., which ultimately became New Kerr-McGee. They have not relinquished their claims against Kerr-McGee Holdco, Inc., but do not dispute that it has no separate existence from New Kerr-McGee.

Pennsylvania state court asserting toxic-tort claims for hundreds of millions of dollars based on the operation of the Avoca Plant. A consolidated "Master Complaint"[7] alleged that, from 1956 through 1996, operations at the Avoca Plant led to the "intentional, negligent[,] and otherwise tortious release of dangerous chemicals" into the environment, causing the Avoca Plaintiffs cancer and other illnesses.

The Master Complaint alleged no direct liability of New Kerr-McGee; it failed to identify any act by New Kerr-McGee that contributed to the injuries of the Avoca Plaintiffs after its creation in 2001.[8] Instead, it alleged the direct liability of only Old Kerr-McGee for its actions as parent of Kerr-McGee Chemical during that entity's operation of the plant. The Master Complaint sought to impute the acts of the plant's prior corporate owners/operators to New Kerr-McGee based on various indirect-liability alter-ego/veil-piercing and successor-

---

[7] The Avoca Plaintiffs did not argue below that the Master Complaint is materially different from the other complaints in the PA State Action, and their brief here refers us to the Master Complaint. *See, e.g.*, Appellants' Br. 8-9. Thus, although we refer only to the Master Complaint, our analysis applies equally to all complaints in the PA State Action.

[8] The Master Complaint has the precision of birdshot. It often lumps all three defendants together, or refers to them separately as "Kerr-McGee." The only specific mention of New Kerr-McGee comes in the recitation of the corporate history at paragraph 18. *See* J.A. 503.

liability theories.[9] Specifically, the Master Complaint alleged that Old Kerr-McGee

> provided environmental policies, legal counsel, hydrological services and laboratory technical services in connection with the operation of the wood treatment plant [the Avoca Plant]. Furthermore, [Old Kerr-McGee] communicated with environmental agencies and approved and controlled environmental budgets and expenditures in connection with the wood treatment plant. [Old Kerr-McGee] controlled the wood treatment plant's facility's environmental changes and monitoring and also directed the Plaintiffs' managers as to environmental policies and decisions, including emission controls, regulatory compliance issues, regulatory reporting and toxic waste handling.

J.A. 504-05 (Master Compl. ¶ 21); *see also* Appellants' Br. 9 (explaining that paragraph 21 refers to the conduct of Old Kerr-McGee).

---

[9] *See* Appellants' Br. 9 (explaining that the Master Complaint's allegations against New Kerr-McGee appear at paragraphs 19-20 and seek to hold "New [Kerr-McGee] responsible for the acts of its subsidiary, which operated the plant" (citing J.A. 503-04 (Master Compl. ¶¶ 19-20)).

## III. THE TRONOX BANKRUPTCY AND THE ADVERSARY PROCEEDING

In 2009, the Tronox debtors, Tronox LLC and Tronox Worldwide LLC (f/k/a Kerr-McGee Chemical and Kerr-McGee Operating Corp. (i.e., Old Kerr-McGee), respectively), filed for Chapter 11 bankruptcy in the Southern District of New York. Because the principal defendants in the PA State Action—Kerr-McGee Chemical and Old Kerr-McGee—were debtors in the Tronox bankruptcy, the PA State Action was stayed and remains stayed.

In the bankruptcy proceeding, each of the Avoca Plaintiffs, as claimant creditors, filed a proof of claim seeking compensation for the toxic torts at the heart of the PA State Action and reserving any claims against non-debtors. The United States, as a major creditor of the Tronox debtors, subsequently intervened. *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.) ("Anadarko")*, No. 14-cv-5495, 2014 WL 5825308, at *2 (S.D.N.Y. Nov. 10, 2014).

In May 2009, the Tronox debtors initiated an adversary proceeding in the bankruptcy court against New Kerr-McGee, asserting fraudulent-transfer claims (the "Adversary Proceeding").[10] In 2010, with the Adversary

---

[10] After the spinoff, Anadarko Petroleum Corporation acquired New Kerr-McGee. The Tronox debtors named Anadarko as a defendant in the Adversary Proceeding for its alleged role in the spinoff, but all claims against Anadarko were ultimately

Proceeding still pending, the bankruptcy court approved the Tronox bankruptcy plan (the "Plan"). Because the potential recovery from that proceeding was an important estate asset, as part of the Plan, the Tronox debtors transferred their interest in the Adversary Proceeding to a specially formed "Anadarko Litigation Trust" (also referred to as the "Litigation Trust"). *See* J.A. 49 (Plan), 448-80 (Litigation Trust Agreement). The Plan made the Avoca Plaintiffs (among other claimants) beneficiaries of a "Tort Claims Trust," which would receive a specified share (12%) of any recovery from the Adversary Proceeding. *See* J.A. 48 (Plan), 272 (Tort Claims Trust Agreement).  In return, the Avoca Plaintiffs (and the other claimants) agreed to release their creditor claims against the Tronox debtors and to be enjoined from pursuing certain claims against the Tronox debtors and other released parties, including New Kerr-McGee. *See* J.A. 48 (Plan), 68-69 (release and injunction), 89 ¶ 1.9 (definition of the "Anadarko Released Parties").

The Adversary Proceeding continued for years. The Anadarko Litigation Trust and the United States jointly pursued the Adversary Proceeding against New Kerr-McGee and its parent, Anadarko. The Avoca Plaintiffs were not silent partners in this endeavor. The Plan provided that "representatives of the holders of Tort Claims will have certain agreed rights concerning the pursuit" of the

dismissed. Nevertheless, the Adversary Proceeding remained known as the "Anadarko Litigation."  Appellees' Br. 9 n.2. For ease of reference, we refer to it as the "Adversary Proceeding" throughout.

Adversary Proceeding. J.A. 49. And participate the Avoca Plaintiffs did: among other things, two of their lawyers sat on the Tort Claims Trust's Advisory Committee.

In December 2013, after trial over a four-month period, Bankruptcy Judge Gropper issued an opinion holding, *inter alia*, that New Kerr-McGee had "acted with intent to 'hinder and delay' [the Tronox debtors'] creditors when they transferred out and then spun off the oil and gas assets, and that the [spinoff] transaction, which left the Debtors insolvent and undercapitalized, was not made for reasonably equivalent value." *In re Tronox*, 503 B.R. at 249. However, Judge Gropper reserved decision and final judgment on damages, which he indicated would be between $5.15 billion and $14.16 billion. *See id.* at 336-37, 347.

In April 2014, before a final judgment was entered, the parties settled the Adversary Proceeding for $5.15 billion (the "Settlement Agreement").[11] *See* J.A. 81-139. The Tort Claims Trust's share was more than $600 million.[12] Because no judgment had ever issued, Judge Gropper's liability findings never became final and binding.

---

[11] At the time, the settlement was "the largest-ever environmental cleanup recovery." J.A. 203.

[12] The bankruptcy court estimated the present value of the toxic-tort claims, as of 2005, to be $257 million, approximately 40 percent of the actual amount received. *In re Tronox*, 503 B.R. at 315.

## IV. THE INJUNCTION

In exchange for New Kerr-McGee's payment of $5.15 billion, the parties agreed to a permanent injunction to insulate New Kerr-McGee from claims related to those the Adversary Proceeding's settlement extinguished. The District Court agreed and entered the following Injunction:

> (i) [A]ny Debtor(s), (ii) any creditor of any Debtor who filed or could have filed a claim in the Chapter 11 Cases, (iii) any other Person whose claim (A) in any way arises from or is related to the Adversary Proceeding, (B) is a Trust Derivative Claim, or (C) is duplicative of a Trust Derivative Claim, and (iv) any Person acting or purporting to act as an attorney for any of the preceding *is hereby permanently enjoined from asserting against any Anadarko Released Party* (I) any Trust Derivative Claims or (II) any claims that are duplicative of Trust Derivative Claims, whether or not held or controlled by the Litigation Trust, or whether or not the Litigation Trust could have asserted such claims against any Anadarko Released Party.
>
> The injunction herein shall not apply to or bar [eight classes of claims, including] . . . any liability that an Anadarko Released Party might have that does not arise from or through a liability of a Debtor . . . .

*Anadarko*, 2014 WL 5825308, at *10 (emphasis added); *see also* J.A. 223-24.[13]

The Avoca Plaintiffs did not comment on or object to the proposed order. No one appealed the Injunction; it became final in early 2015.

## V.    POST-INJUNCTION LITIGATION

In September 2015, the Avoca Plaintiffs filed a motion in Pennsylvania state court to restore their toxic-tort case to the calendar (the "Avoca Motion" or the "Motion"). J.A. 231-56. Despite detailing the history of the PA State Action, the Tronox bankruptcy, and the Adversary Proceeding, the Avoca Motion says nothing as to the effect, if any, of those proceedings and the resulting Settlement Agreement and Injunction on their state-court claims.  In fact, the Avoca Motion curiously neither mentions the Injunction nor seeks to amend the Master Complaint. It simply asks the Pennsylvania court to reactivate the state proceedings in light of the termination of the bankruptcy stay following the Adversary Proceeding.

The Avoca Plaintiffs' assertions against New Kerr-McGee—derived primarily from Judge Gropper's pre-judgment findings[14]—mimic the legal theories employed by

---

[13] The Injunction and pertinent defined terms, including "Adversary Proceeding," "Anadarko Released Party," and "Trust Derivative Claims" are reprinted at Appendix B for ease of reference.

[14] The Avoca Motion notes that Judge Gropper determined New Kerr-McGee "(a) undercapitalized its fraudulent spawn Tronox;

15

the Litigation Trust in the Adversary Proceeding. The Motion argues that the Avoca Plaintiffs seek to hold New Kerr-McGee liable "under numerous theories including, but not limited to, alter ego/piercing of the corporate veil and successor liability." J.A. 243 ¶ 59. There are no claims or allegations that New Kerr-McGee itself engaged in wrongful conduct that directly harmed the Avoca Plaintiffs.

New Kerr-McGee subsequently moved in the District Court to enforce the Injunction. The District Court granted New Kerr-McGee's motion, ordering the Avoca Plaintiffs to dismiss with prejudice their state-court action. *In re Tronox Inc.*, 549 B.R. 21 (S.D.N.Y. 2016).

It is clear from the District Court's detailed decision that its job was not made any easier by the efforts of the Avoca Plaintiffs' counsel. As the District Court explained:

> [T]he Avoca Plaintiffs' position as to which slices of their claims remain has been a moving target, as they have revised their theories at each opportunity. Although oral argument helped clarify their most recent position, the Avoca Plaintiffs did not clearly articulate which, if any, of the potential bases for holding [New Kerr-

(b) failed to adhere to corporate formalities; (c) substantially intermingled corporate affairs; and (d) most certainly used the corporate form to perpetrate a massive fraud the Court determined to be valued as much as $14.14 Billion Dollars [*sic*]." J.A. 243 ¶ 58.

16

McGee] liable they agree are no longer tenable as a result of the release obtained as part of Tronox's bankruptcy.

*Id.* at 46.

Ultimately, the court made two rulings: (1) the Avoca Plaintiffs' claims were extinguished by the Settlement Agreement; and (2) even if they were not, the claims are barred by the Injunction. The District Court and New Kerr-McGee characterize the rulings as alternative holdings, in that they equally resolve that *all* claims are somehow barred. *See id.* at 50 ("Even if the Avoca Plaintiffs' claims were not otherwise unavailable as a matter of law, the Injunction separately bars any claim against the movant herein that they seek to assert."); Appellees' Br. 47-48 (urging us to affirm based on the District Court's "alternative holding" that the claims were extinguished by the Avoca Plaintiffs' assent to and recovery from the settlement). In our view, however, our job on appeal is to first determine the reach of the Injunction.

Relying on the Injunction's plain language and fundamental principles of bankruptcy law, the District Court interpreted the Injunction—particularly the term "Trust Derivative Claims"—to cover "action[s] . . . intended to increase the basket of assets for creditors regarding[ *inter alia*, the Avoca Plant], or based on prior ownership of a debtor . . . ." *In re Tronox Inc.*, 549 B.R. at 51. In other words, the District Court read the Injunction to bar "claims that were or could have been part of an adversary proceeding by [the Tronox debtors] against [New] Kerr-McGee." *Id.*

17

Judge Forrest then concluded that the claims the Avoca Plaintiffs currently allege in state court fall squarely within that definition.

Specifically, she reasoned that (a) the Avoca Plaintiffs could not assert any direct-liability claims against New Kerr-McGee for conduct during the Avoca Plant's operations from 1956 to 1996, since New Kerr-McGee did not exist until 2001, and (b) the Avoca Plaintiffs had not asserted any direct-liability claims against New Kerr-McGee for conduct after 2001. Thus, the only claims the Avoca Plaintiffs raised were indirect-liability claims based on alter-ego/veil-piercing theories—attempts to impute to New Kerr-McGee the conduct of Old Kerr-McGee and Kerr-McGee Chemical. Read that way, the District Court found that the Avoca Plaintiffs' claims were "generalized to all creditors because they could be equally asserted (if they were not barred by the release) by any creditor of the Tronox debtor[s] . . . whose claim has been left partially unsatisfied by recovery efforts from the Tronox debtors themselves." *Id.* at 53. For that reason, the claims were derivative and therefore property of the Tronox estate. *Id.* at 54. Concluding that the term "Trust Derivative Claims," as defined in the Injunction, was coextensive with the meaning of derivative claims in the bankruptcy context, the District Court held that the Avoca Plaintiffs' claims were barred by the Injunction. *Id.*

The District Court finally concluded that it was within its discretion and power to enforce the Injunction, and enforcement served the interest of "preventing litigation the pursuit of which is violative of an injunction

18

previously issued by this Court." *Id.* at 55. In rejecting the Avoca Plaintiffs' request for the opportunity to replead in state court, the District Court noted that the Avoca Plaintiffs "had ample opportunity to work out their theories and present their strongest possible claims," yet "have provided no fact that would save their claims." *Id.* at 55-56. The District Court also noted concern that the Avoca Plaintiffs' request to allow them to seek leave to amend in state court was "in all events gamesmanship." *Id.* at 56. That view was "bolstered by the recent refusal of the Avoca Plaintiffs to dismiss their claims against the Tronox debtors—parties as to whom they have no credible arguments that any claim survives." *Id.*

Thus, the District Court ordered the Avoca Plaintiffs to dismiss with prejudice the PA State Action within seven days and to make no attempt to file any action alleging similar claims against New Kerr-McGee or any Tronox debtor in any other forum. *Id.* Although New Kerr-McGee had initially sought an order to show cause why the Avoca Plaintiffs and their counsel should not be held in contempt for violating the Injunction, the District Court deemed that request abandoned because, in part, New Kerr-McGee did not renew it in its reply brief or at oral argument. *Id.* at 38 n.11.

## VI.   PROCEEDINGS IN THIS COURT

Three days prior to the District Court's deadline for dismissal of the PA State Action, the Avoca Plaintiffs moved for an emergency stay in this Court. In its opposing papers, New Kerr-McGee did not move to dismiss, but

19

argued that the Avoca Plaintiffs were unlikely to prevail on the merits of the appeal because we lack appellate jurisdiction. A judge of this Court granted a temporary stay pending conclusive disposition of the emergency motion by a motions panel, and directed the Avoca Plaintiffs to file a reply to New Kerr-McGee's jurisdictional argument. After the Avoca Plaintiffs filed a reply, a full motions panel granted the stay pending appeal, referring "the question of whether this Court has proper jurisdiction over this matter . . . to the merits panel." 2d Cir. Dkt. 64 (order granting stay pending appeal).

## DISCUSSION

Although New Kerr-McGee has yet to move to dismiss, it continues to argue that there is no jurisdictional hook for this appeal. Federal courts at all levels always begin their work with a simple question: Has Congress given us authority to hear and decide this matter? Statutory jurisdiction goes to the heart of a federal court's power, and federal courts have an "independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*." *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) (citing *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 328 (2d Cir. 2005)). We therefore must conduct a jurisdictional inquiry notwithstanding New Kerr-McGee's curious reluctance to move to dismiss on jurisdictional grounds while continuing to point out the flimsiness of the Avoca Plaintiffs' jurisdictional predicate.

There are a couple relevant avenues to appellate jurisdiction here: 28 U.S.C. § 1291 (conferring appellate

20

jurisdiction over "final decisions" of district courts) and 28 U.S.C. § 1292 (conferring appellate jurisdiction over, *inter alia*, orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions"). New Kerr-McGee argues that neither section confers appellate jurisdiction over post-judgment orders that do nothing more than interpret and enforce a final injunction. It would be different, New Kerr-McGee urges, if the District Court had found contempt, imposed sanctions, or created new duties under the Injunction. Instead, New Kerr-McGee asserts, the District Court merely "reiterated the plain meaning of the Injunction and gave the Avoca Plaintiffs a grace period to comply." Appellees' Br. 18.

The Avoca Plaintiffs counter that we have § 1291 jurisdiction because the District Court's order "finally determines the rights of the Avoca Plaintiffs," and "[t]here was nothing left to be determined." Appellants' Reply Br. 3-4.[15] Even if the order fails on finality, the Avoca Plaintiffs contend we still have jurisdiction under § 1292 because the District Court's order modified the Injunction by expanding the definition of "Trust Derivative Claims" in the Injunction

---

[15] The Avoca Plaintiffs' opening brief did not newly address jurisdiction, but instead relied on their briefing in support of the stay motion. After New Kerr-McGee offered additional jurisdictional argument in its merits brief, the Avoca Plaintiffs took the invitation to address jurisdiction in their merits reply. Thus, the Avoca Plaintiffs' jurisdictional arguments are primarily in their reply briefs (on the stay motion and the merits).

to mean "all derivative claims."[16] Appellants' Reply Br. 7-8 (emphasis omitted).

New Kerr-McGee has it right. We lack jurisdiction because the order did not find contempt, issue sanctions, or modify the injunction.

## I. THE DISTRICT COURT'S ORDER IS NOT "FINAL" FOR PURPOSES OF 28 U.S.C. § 1291

"It is a well-established rule of appellate jurisdiction that 'a final order is one that conclusively determines the rights of the parties to the litigation, leaving nothing for the district court to do but execute the order.'" *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 410 (2d Cir. 1997) (quoting *In re Fugazy Express, Inc.*, 982 F.2d 769, 775 (2d Cir. 1992)). Generally, orders finding a party in contempt but

---

[16] The Avoca Plaintiffs also assert jurisdiction under 28 U.S.C. § 158(d), which gives courts of appeals jurisdiction over, as relevant here, "final decisions, judgments, orders, and decrees" by district courts reviewing bankruptcy court orders. Section 158(d) is inapplicable here. This appeal is not from an order of the District Court reviewing a bankruptcy court order. The two cases that the Avoca Plaintiffs cite for the proposition that the District Court's order is appealable under § 158, by contrast, involved appeals from a district court's approval of bankruptcy settlement orders. *See* Appellants' Stay Reply Br. 5 (citing *In re Smart World Tech., LLC*, 423 F.3d 166 (2d Cir. 2005); *In re Heiserman*, 52 F. App'x 929 (9th Cir. 2002)). The Avoca Plaintiffs could have appealed the District Court's initial approval of the Tronox bankruptcy settlement under § 158(d), but chose not to. Section 158(d) provides them no cover now.

not imposing sanctions are not immediately appealable. *See id.* ("[A]n order adjudging a party in contempt unaccompanied by sanctions is not final and therefore is not appealable.").

Our decision in *Wilder v. Bernstein*, 49 F.3d 69 (2d Cir. 1995), and the Eleventh Circuit's decision in *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814 (11th Cir. 2010), are instructive. In both, the district court interpreted the meaning of and directed compliance with its final order (a consent decree in *Wilder* and an anti-suit injunction in *Thomas*), but did not find contempt or impose sanctions. Specifically, in *Wilder*, the plaintiffs sued New York City asserting racial discrimination in foster-care policies. The parties entered into a consent decree in which the City agreed to certain changes in its practices. 49 F.3d at 70-71. The plaintiffs later sought contempt sanctions against the City based on its alleged failure to comply. The district court did not find the City in contempt or impose sanctions, but directed it to take "all appropriate steps" to implement the consent decree. *Id.* at 71-72 (quoting *Wilder v. Bernstein*, 153 F.R.D. 524, 535 (S.D.N.Y. 1994)). We dismissed the appeal for lack of jurisdiction, ruling that because "there ha[d] not been a finding of contempt, much less an assessment of sanctions, the order [was] not 'final.'" *Id.* at 72 (citing *Dove v. Atl. Capital Corp.*, 963 F.2d 15, 17-18 (2d Cir. 1992)). The Eleventh Circuit did the same in *Thomas*, raising the issue of jurisdiction *sua sponte* and concluding that the district court's order directing the plaintiff to withdraw his breach-of-contract complaint within twenty days was not final under § 1291, did not fall within the

23

collateral order doctrine,[17] and did not grant or modify an injunction under § 1292(a)(1). *See Thomas*, 594 F.3d at 818-20.

Here, as in *Wilder*, the District Court's order was issued in the context of a pending contempt motion but made no contempt finding, "much less an assessment of sanctions." *See Wilder*, 49 F.3d at 72. Therefore, it is not "final" as contemplated by § 1291. The District Court proceedings concerning compliance with the Injunction will not reach final adjudication until such time as the contempt issue is fully resolved. For present purposes, that will occur if the Avoca Plaintiffs refuse to comply and are sanctioned.

The only potential, yet ultimately inconsequential, distinction that the Avoca Plaintiffs raise between this case and *Wilder* and *Thomas* is that New Kerr-McGee somehow "abandoned" its request for a contempt finding or sanctions. Appellants' Stay Reply Br. 4 (citing *In re Tronox*

---

[17] The Avoca Plaintiffs do not argue that the District Court's order falls within the small class of decisions excepted from the final-judgment rule under the collateral order doctrine, for good reason. The order is at the heart of the merits of the proceedings and therefore not collateral. Moreover, the order is not effectively unreviewable on appeal from a final judgment; if the Avoca Plaintiffs refuse to dismiss the PA State Action and the District Court finds contempt or imposes sanctions, the Avoca Plaintiffs can appeal from that ruling. We note that because our jurisdictional analysis under 28 U.S.C. § 1292 requires an analysis of the merits of the District Court's interpretation of the Injunction, a subsequent appeal would have to overcome any preclusive effects of this opinion.

*Inc.*, 549 B.R. at 38 n.11). In *Thomas*, they claim, the order was not final because "it [did] not dispose of all of the issues raised in the motion. . . . The order *expressly contemplated further action* in the event that [the plaintiff] failed to withdraw his claim within 20 days. It stated . . . 'the contempt motion shall be revisited by this Court.'" *Id.* (quoting *Thomas*, 594 F.3d at 819). By contrast, here, the Avoca Plaintiffs argue, "the present Order expressly contemplates that it has finally adjudicated the Avoca Plaintiffs' rights, and that the motion is now finally 'closed.'" *Id.* (footnote omitted). Thus, they claim that "[a]ny notion of contempt proceedings, as stated, was then off the table, 'abandoned.'" *Id.*

The Avoca Plaintiffs miss the point. The District Court's order did two things, and two things only: (1) it interpreted the Injunction and Settlement Agreement to bar the Avoca Plaintiffs' state-court claims, and (2) it directed them to dismiss the state action—i.e., it enforced the Injunction and Settlement Agreement by directing compliance therewith. There is nothing more final about the order here than the orders in *Wilder* and *Thomas*.

This result also makes good sense in light of "the historic federal policy against piecemeal appeals." *See Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956). If § 1291 required us to entertain appeals every time a district court interpreted or issued an order enforcing a final injunction without more, we would risk being "besieged by successive appeals in injunctive proceedings." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Ill. State Bd. of Elections*, 75 F.3d 304, 306 (7th Cir. 1996). Even more, § 1292(a)(1)—which

25

provides for immediate appeal of certain injunction-related orders, but not interpretive or enforcement orders—would be rendered, at least partially, superfluous.

## II. THE DISTRICT COURT'S ORDER IS NOT APPEALABLE UNDER 28 U.S.C. § 1292(A)(1)

Section 1292(a)(1) allows interlocutory appeals from orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). The parties agree that the only relevant consideration here is whether the District Court's order somehow modified the Injunction.[18] Though

---

[18] The Avoca Plaintiffs also argue briefly that the District Court's order does not merely interpret the Injunction, but "continues" it. They are wrong. "An order that continu[es] an injunction is one that extends the duration of the injunction, that is, one entered in circumstances where, without such order, the injunction would stand dissolved by lapse of the time fixed in the original order." *In re Fugazy Express*, 982 F.2d at 777 (alteration in original) (citations and internal quotation marks omitted). Here, the Injunction is permanent. Moreover, if an order enforcing an injunction were held to be continuing the injunction, any post-judgment order that fell short of terminating an injunction would qualify to trigger § 1292(a). That cannot be. The cases cited by the Avoca Plaintiffs on this point are distinguishable. Appellants' Stay Reply Br. 8. One deals with a preliminary, as opposed to permanent, injunction. *See Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368, 1370 (5th Cir. 1986). The other involves a refusal to modify a consent decree to protect plaintiffs from irreparable injury. *Ho ex rel. Ho v. S.F. Unified Sch. Dist.*, 147 F.3d 854, 860 (9th Cir. 1998). Thus,

the order did not purport to modify the Injunction, we do not simply take the District Court's word for it. Rather, we look to whether the order was, in fact, merely interpretive, and did "not change the meaning of—that is, modify—the . . . [I]njunction." *ACORN*, 75 F.3d at 306. To determine if the Injunction has been modified, we have to understand if the District Court extended the Injunction beyond its original reach. That is, if Judge Forrest properly construed the Injunction to bar the Avoca Plaintiffs' claims, she did not modify it; but if she erred in her construction, she did modify it. *See Wilder*, 49 F.3d at 72.

In distinguishing interpretation from modification, *Wilder* tells us to apply *de novo* review. *See id.* (citing *United States v. O'Rourke*, 943 F.2d 180, 186 (2d Cir. 1991)); *see also EEOC v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 76 F.3d 76, 79 n.2 (2d Cir. 1996) (citing *Wilder* while noting that "we must at least look through the door" to the merits "to see if we should open it" (internal quotation marks omitted)). It is unclear, however, how searching that review should be. A plurality of our sister circuits have acknowledged that while "the scope of the injunction is to be determined by the independent judgment of [Courts of Appeals]," the reviewing court must "approach the question with the purpose of fulfilling the statutory goal of not 'letting piecemeal appeals, cloaked in the guise of jurisdictional

---

both cases, unlike this one, involved the duration of less-than-permanent injunctions.

27

inquiries, come in through the back door.'" *United States v. Philip Morris USA Inc.*, 686 F.3d 839, 844 (D.C. Cir. 2012) (quoting *Birmingham Fire Fighters Ass'n 117 v. Jefferson Cty.*, 280 F.3d 1289, 1293 (11th Cir. 2002)). Those courts—including the Seventh, Tenth, Eleventh, and D.C. Circuits—look to whether the district court's order constitutes an obvious misinterpretation of the injunction.[19] Counseling against too searching of a merits inquiry at the jurisdictional stage, those circuits have voiced similar concerns that "[t]o plunge into the details would collapse the jurisdictional inquiry into a decision on the merits,

---

[19] *See Philip Morris*, 686 F.3d at 845 (adopting the circumscribed approach of the other circuits); *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1154-55 (10th Cir. 2007) (explaining that it does not "analyze the injunction and the order in detail" because only "gross or blatant misinterpretation[s] of the original injunction" amount to modifications under § 1292(a)(1) (internal quotation marks omitted)); *Birmingham Fire Fighters*, 280 F.3d at 1292; *Gautreaux v. Chi. Hous. Auth.*, 178 F.3d 951, 957-58 (7th Cir. 1999) (explaining that only "obvious misinterpretation[s]" are sufficient to "trigger appellate jurisdiction under § 1292(a)(1)," and rejecting defendant's request for "an all-out inquiry into the merits" of the at-issue order because "such an analysis would aim to uncover subtle rather than blatant misinterpretations and is therefore too searching for a preliminary jurisdictional inquiry"); *accord Southern Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1209 (10th Cir. 2009) (noting that "the benchmark for when an order modifies an injunction is a high one," and that the "detailed analysis . . . requested by the [appealing party] is inconsistent with [the *Pimentel*] standard of review").

28

thwarting the purpose of § 1292(a)(1)." *Birmingham Fire Fighters*, 280 F.3d at 1293.

Although we have never expressly adopted the limited approach, we have endorsed it by summary order. *Scipar, Inc. v. Simses*, 354 F. App'x 560, 562-63 (2d Cir. 2009) (citing *Wilder* and the decisions of the Seventh, Tenth, and Eleventh Circuits). Such an approach makes sense, and is consistent with our case law, when evaluating the district court's interpretation of its own order—that is, reviewing a district court's determination of what it meant when it employed language that is later subject to question. *See In re Bernard L. Madoff Inv. Sec. LLC ("Madoff")*, 740 F.3d 81, 87 n.7 (2d Cir. 2014) (stating that a court's interpretation of its own injunction "warrants customary appellate deference") (quoting *Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 333 (2d Cir. 1999))); *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) (per curiam) (reviewing with great deference a court's interpretation of its own order). But when, as here, the language the district court is interpreting is tied to a term defined by law (e.g., "derivative claims" as used in the bankruptcy context), the court's conclusion is a legal one and is reviewed *de novo*. *See In re DeTrano*, 326 F.3d 319, 321 (2d Cir. 2003) (noting that in a typical bankruptcy appeal under § 158(d), "[t]he bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*.").

To be clear, to the extent the District Court interpreted "Trust Derivative Claims" to mean all derivative claims within a bankruptcy court's jurisdiction, its interpretation is entitled to deference and will not

29

constitute a modification unless it is an obvious or blatant misinterpretation. *See, e.g.*, *Birmingham Fire Fighters*, 280 F.3d at 1293. However, we review *de novo* the District Court's conclusion that the Avoca Plaintiffs' claims are in fact derivative claims within a bankruptcy court's jurisdiction.[20] The merits of New Kerr-McGee's enforcement claims are therefore unavoidably linked to the jurisdictional question. The result turns on whether the Avoca Plaintiffs' claims are in fact "derivative" as that term is used in the bankruptcy context—i.e., whether the claims are property of the estate—and whether the District Court obviously or blatantly misinterpreted the Injunction's definition of "Trust Derivative Claims."

## A.    All of the Avoca Plaintiffs' Claims Are "Derivative" Claims—i.e., Estate Property

### i.    *The Law on Derivative Claims*

When, as here, a company files for bankruptcy, the automatic-stay provision of the Bankruptcy Code, 11 U.S.C.

---

[20] The nature of the Injunction and the district court's dual analysis of both the language of the Injunction (for which its views deserve deference) and the relationship of that language to legal standards (which present clear issues of law reviewed by us in the normal course) present an interesting twist to the jurisdictional inquiry but should not be seen as an invitation for "piecemeal appeals[] cloaked in the guise of jurisdictional inquiries, [to] come in through the back door." *Id.* at 1293. Injunctions tied to the factual circumstances of the parties that do not employ a legal principle to measure their scope will fall under the more deferential standard of review noted above.

§ 362, operates to prevent certain creditors from "pursu[ing] their own remedies against the debtor's property." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc. ("St. Paul")*, 884 F.2d 688, 701 (2d Cir. 1989). Congress's intent was "to protect all creditors by making the trustee the proper person to assert claims against the debtor." *Id.* "This reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion." *Id.* While bankruptcy courts generally have limited authority to release a non-debtor's independent claims, so-called "derivative claims"—i.e., claims "based on rights 'derivative' of, or 'derived' from, the debtor's"—typically constitute "property of the estate." *Madoff*, 740 F.3d at 88. In other words, "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

"Derivative claims" in the bankruptcy context are those that "'arise[] from harm done to the estate' and that 'seek [] relief against third parties that pushed the debtor into bankruptcy.'" *Madoff*, 740 F.3d at 89 (alterations in original) (quoting *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC) ("JPMorgan")*, 721 F.3d 54, 70 (2d Cir. 2013)). In distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy. *See id.* at 91-92. In other words, we are wary of putting form over substance. *See id.* at 89, 91-92. Thus, we "inquire into the

31

factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Id.* at 89 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.) ("Manville III")*, 517 F.3d 52, 67 (2d Cir. 2008), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)). If the claim "is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul*, 884 F.2d at 701. Whereas a derivative injury "is based upon 'a secondary effect from harm done to [the debtor],' an injury is said to be 'particularized' when it can be 'directly traced to [the third party's] conduct.'" *Madoff*, 740 F.3d at 89 (alterations in original) (quoting *St. Paul*, 884 F.2d at 704). Non-derivative claims are personal to the individual creditor and of no interest to the others.

As difficult a task as it may be to distinguish derivative from non-derivative claims, our prior decisions—namely, *St. Paul*, *Manville III*, *JPMorgan*, and *Madoff*, each employed by the District Court—and the Third Circuit's divided-panel decision in *In re Emoral, Inc. ("Emoral")*, 740 F.3d 875 (3d Cir. 2014), have done much of the legwork. Those cases and general principles of bankruptcy law persuade us that the Avoca Plaintiffs' claims against New Kerr-McGee are generic, derivative claims.

***St. Paul.*** In *St. Paul*, PepsiCo sued Banner, the corporate parent of the debtor, for claims PepsiCo had against the debtor, claiming that Banner had stripped away

the assets of its alter ego subsidiary, the debtor.[21] 884 F.2d at 692. PepsiCo argued that its claim was particularized, emphasizing its individualized harm suffered at the hands of the debtor. *Id.* at 703-04. We determined that PepsiCo's harm stemmed from its original relationship to the debtor, not Banner. *Id.* at 704. But that harm—the failure to honor contractual obligations—was not the harm for which PepsiCo sought redress against Banner. *See id.* Instead, PepsiCo "alleged a secondary effect from harm done to [the debtor]" by Banner—removing assets from the debtor that would have allowed it to meets its obligations to PepsiCo and other creditors. *Id.* Thus, we held the proper remedy for any harm caused by Banner to the debtor, and in turn all of its creditors, was "for the trustee to bring an alter ego claim as property of the estate, . . . or to bring an action alleging preferential or fraudulent transfer of assets to Banner." *Id.*

***Manville III.*** To understand *Manville III*, one must appreciate the context in which it was decided. The bankruptcy of the Johns-Manville Corporation ("Manville") produced a number of cases in this Court. In one of those cases, a distributor of Manville's products, alleging that it was a coinsured under Manville's insurance policies, challenged the bankruptcy court's authority to enter an

---

[21] Like Delaware corporate law (which New Kerr-McGee argues applies to the case before us) and Pennsylvania law (which the Avoca Plaintiffs argue applies to the case before us), *see infra* at 36, Ohio law allowed a subsidiary to pierce its own veil, *see St. Paul*, 884 F.2d at 695.

injunction barring what the distributor argued were independent contract-based claims against the insurer. *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) ("Manville I")*, 837 F.2d 89 (2d Cir. 1988). We rejected the distributor's characterization, holding that the distributor's claims, whether sounding in tort or contract, were "derivative" of Manville's because they sought recovery "out of the proceeds of Manville's insurance policies on the basis of Manville's conduct." *Id.* at 92-93.

*Manville III* was a very different case from *Manville I*. There, asbestos victims sued the same insurer, but the allegations were that the insurer had tortiously "influenced Manville's purported failure to disclose its knowledge of asbestos hazards." *Manville III*, 517 F.3d at 58.[22] Contrasting those claims with the ones in *Manville I*, we held the claims were non-derivative because they sought to recover for harms done directly to plaintiffs by the insurer through the insurer's own wrongdoing, not for some wrongdoing that affected the estate. *See id.* at 68.

---

[22] The Supreme Court reversed *Manville III* in part on narrow procedural grounds that did not upend our ruling that a bankruptcy court is without jurisdiction to enjoin claims against nondebtors that are not derivative of the debtor's wrongdoing. *Travelers Indem.*, 557 U.S. at 155. Indeed, we affirmed the jurisdictional analysis from *Manville III* in *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.) ("Manville IV")*, 600 F.3d 135, 152 (2d Cir. 2010). *Accord Madoff,* 740 F.3d at 90 n.10.

We also now have the benefit of two recent cases applying the distinction drawn in *Manville III*.

*JPMorgan.* In *JPMorgan*, we held that the liquidation trustee for the estate of Bernard L. Madoff Investment Securities LLC ("BLMIS") lacked standing to bring claims "on behalf of thousands of customers against third-party financial institutions for their handling of individual investments made on various dates in varying amounts" from BLMIS accounts. 721 F.3d at 71. As with the claims in *Manville III*, we determined that the trustee's claims—because they alleged that the third-party financial institutions independently cause particularized harm to individual creditors—were owned by the customers, and were therefore not derivative. *Id.*

*Madoff.* Most recently, in *Madoff*, we considered whether claims by a creditor against a non-debtor were derivative of claims asserted and settled by the BLMIS trustee and therefore barred by the injunction that served as the model for the Injunction here. The trustee in *Madoff* asserted in an adversary proceeding claims for fraudulent transfer, avoidable preferences, and turnover against alleged Madoff co-conspirator Jeffrey Picower and other defendants, based on their alleged improper withdrawals of more than $6.7 billion from BLMIS. *Madoff*, 740 F.3d at 85. During the pendency of settlement negotiations, BLMIS customers (creditors of the BLMIS estate) named the same defendants in a class action in district court alleging, among other things, civil conspiracy and conversion based on similar allegations. *Id.* The bankruptcy proceeding thereafter settled. In confirming the settlement and issuing

an injunction against duplicative and derivative claims, the district court ruled that the class-action claims were barred. *Id.* at 87.

On appeal, we agreed. *Id.* at 96. We were not persuaded by the fact that the plaintiffs alleged different causes of action than had the trustee. There, as here, the plaintiffs did not allege that the defendants took any "particularized" action aimed at them. *Id.* at 93. Instead, they sought to plead around an injunction by focusing on the nature of the relief sought. *See id.* We looked beyond the plaintiffs' labels, and determined that the claims derived from the estate because the "alleged injuries [were] inseparable from, and predicated upon, a legal injury to the estate." *Id.* at 92. We contrasted the claims with those in *Manville III* and *JPMorgan*, and likened them to claims alleged in *Manville I*.[23] *Id.* at 90. The specific damages BLMIS customers sought from Picower and his codefendants—namely, losses and taxes—were not "recoverable in an avoidance action under the Bankruptcy Code." *Id.* at 93 (citing 11 U.S.C. § 550(a) ("[T]he trustee may recover, for the benefit of the estate, the property transferred, or . . . the value of such property . . . .")). Nonetheless, we held that the damages suffered by all BLMIS customers "still remain[ed] mere secondary harms flowing from the

---

[23] We did, however, allow plaintiffs to amend their complaints because there was a conceivable particularized conspiracy that the trustee could not bring. *See id.* at 94. As we later explain, there was good reason to do so there, but not here.

36

Picower defendants' fraudulent withdrawals and the resulting depletion of BLMIS funds." *Id.*

In all but *St. Paul*, the claims at issue were against third parties where the debtors had contractual relations with, but were corporately separate from, those third parties. Here, by contrast, the corporate relationship between New Kerr-McGee and the Tronox debtors presents a new wrinkle. And that is where *Emoral* helps.

***Emoral.*** *Emoral*, similar to the case here, arose in the context of a motion to enforce a court order approving the settlement of a claim for fraudulent transfer. 740 F.3d at 877. The case involved a prepetition sale of assets by Emoral, a company that manufactured diacetyl, a chemical used in food flavoring that was the subject of many toxic-tort suits. *See id.* After Emoral filed for bankruptcy, the trustee brought an adversary proceeding against Aaroma, the buyer of Emoral's assets, alleging that the prepetition sale constituted a fraudulent transfer. *See id.* The parties reached a settlement and, like here, the trustee agreed to release Aaroma from any claims that were property of the Emoral estate. *See id.* At the hearing on the propriety of the settlement, however, the Diacetyl plaintiffs (with the agreement of a representative of the trustee) challenged the release, arguing that any successor-liability claims against Aaroma did not belong to the Emoral estate, and that the trustee was therefore without authority to release them. *See id.* The plaintiffs thereafter sued Aaroma arguing for successor liability, relying on the trustee's arguments that the claims were outside the estate. *See id.* The bankruptcy court agreed, the district court reversed and remanded to

37

the bankruptcy court, and the Third Circuit affirmed the district court's order. *See id.* at 878.

The Third Circuit majority framed the issue (in terms that could be used nearly verbatim here) as one that "require[d] [it] to determine whether personal injury causes of action arising from the alleged wrongful conduct of a debtor corporation, asserted against a third-party non-debtor corporation on a 'mere continuation' theory of successor liability under state law, are properly characterized as 'generalized claims' constituting property of the bankruptcy estate." *Id.* at 876.

The court answered that question in the affirmative. *Id.* at 882. The majority relied on our explication in *St. Paul* that, in analyzing "common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion," if a claim is "a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Id.* at 879 (quoting *St. Paul*, 884 F.2d at 701). In the majority's eyes, the plaintiffs "fail[ed] to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral," or "how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities." *Id.* at 880. Thus, the majority held that the plaintiffs' claim was "general" rather than

38

"individualized," and therefore part of the bankruptcy estate. *Id.* The court emphasized that the "[p]laintiffs' cause of action against Aaroma would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors." *Id.* at 881.

In dissent, Judge Cowen focused on the nature of the initial toxic-tort injury:

> Because the Diacetyl Plaintiffs' [claims] against Aaroma "could [not] be brought by any creditor of the debtor," they constitute individualized claims belonging to the Diacetyl Plaintiffs themselves—and not to the debtor or the bankruptcy estate. Initially, it is uncontested that the underlying personal injury claims against Emoral are individualized in nature. In fact, personal injury and product liability causes of action under state law represent quintessential examples of an individualized claim, i.e., "a 'personal' [claim that is] a legal or equitable interest only of the creditor."

*Id.* at 883 (second and third alteration in original) (quoting *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 170 (3d Cir. 2002)). In Judge Cowen's view, the majority's approach missed the point—the critical question for him was whether the plaintiffs were suing for themselves or for the benefit of all, the former being

individual property and the latter being estate property. *Id.* at 885-86 & n.1.

As did the *Emoral* majority opinion, we disagree with the dissenting opinion's focus on the nature of the toxic-tort injury. That the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate. Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise. But often there are claims against third parties that wrongfully deplete the debtor's assets. Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor. The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate. Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.[24]

---

[24] Perhaps it would be a different matter if state law recognized a difference in successor liability between tort and contract claims. But, in any event, the parties have not raised the issue and we need not decide it.

The plaintiffs in *Emoral* would have courts allow an individual creditor to sue third-party successors of debtors for claims that are truly aimed at recovering estate assets. The exact same claim advanced by the trustee on behalf of the estate would be a win for all creditors of the estate, but a win by a single creditor would be a win by one to the detriment of the others. That "is precisely the sort of result the Bankruptcy Code exists to forestall, by placing exclusive standing over estate claims in the bankruptcy trustee or plan administrator." *In re Coudert Bros. LLP*, No. 11-2785, 2012 WL 1267827, at *6 (S.D.N.Y. Apr. 12, 2012). The Avoca Plaintiffs ask the same of us, and we will not allow it.

### ii. *The Avoca Plaintiffs' Claims Are Derivative*

As an initial matter, it is undisputed that under either Pennsylvania or Delaware law the Adversary Proceeding could have included indirect-liability claims—based on imputation theories such as alter ego or veil piercing—to the extent the claims qualify as "general."[25] *Accord In re Apler Holdings USA, Inc.*, 398 B.R. 736, 759 (S.D.N.Y. 2008) ("[U]nder Delaware law, a trustee possesses standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim."); *In re Jamuna Real Estate, LLC*, 365 B.R. 540, 562-63 (Bankr. E.D. Pa. 2007) (allowing trustees to assert alter-ego and veil-piercing

---

[25] For this reason, we need not resolve the parties' dispute concerning which state's law governs here.

claims under Pennsylvania law); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 136-37 (Bankr. D. Del. 2005) (holding similarly vis-à-vis successor liability and alter-ego claims under Delaware law). Thus, the question is whether the causes of action here qualify as "general" claims. They do.

We start with what the Avoca Plaintiffs concede:

(1)    They pursue claims against only New Kerr-McGee;

(2)    Any claims against the Tronox debtors were discharged by the bankruptcy plan;

(3)    Tronox LLC succeeded the operator of the Avoca Plant and Tronox Worldwide LLC succeeded the parent of Tronox LLC;

(4)    New Kerr-McGee (and its predecessor, Kerr-McGee Holdco, Inc., formed earlier in the same year) did not exist until 2001; and

(5)    Any claims against New Kerr-McGee for harm done to the Tronox estate are barred as Trust Derivative Claims.

With that as a baseline, we turn to what the claims *are not*. The Avoca Plaintiffs do not, and indeed could not, assert direct-liability claims that New Kerr-McGee breached an independent duty to them arising out of the operation of the Avoca Plant, since New Kerr-McGee did not exist until years after plant operations ceased. Of course, as the District Court acknowledged and New Kerr-McGee conceded, the Avoca Plaintiffs could have raised direct

42

claims that, for instance, New Kerr-McGee instructed its subsidiaries not to clean up the toxic site or were negligent in their supervision of the cleanup. The harm in that instance would have been suffered directly and solely by the Avoca Plaintiffs by acts of New Kerr-McGee. As we held in *Manville III* and *JPMorgan*, those claims would be independent and particularized, belonging only to the Avoca Plaintiffs as individual creditors. The Avoca Plaintiffs, however, have never alleged, and until recently had conceded that they could not allege, facts to support a theory of direct liability against New Kerr-McGee.

At oral argument before this Court, counsel for the Avoca Plaintiffs stated "there is clearly the opportunity to have a direct claim here." For the first time, counsel mentioned a December 2002 letter from New Kerr-McGee to the Environmental Protection Agency ("EPA") alerting the EPA to its ownership of the Avoca Plant and efforts to remediate. This post-2001 conduct, Plaintiffs' counsel now asserts, could have formed the basis for still unidentified and unspecified claims in a theoretical amended complaint. This painfully late assertion, unsupported by the record,[26] bespeaks gamesmanship, but is best left to later review of

------

[26] As best can be gleaned from an independent review of the record on appeal, there is no reference to the alleged 2002 letter. Indeed, the only references to letter exchanges with the EPA appear in the Avoca Motion, and relate only to Old Kerr-McGee's receipt of letters *from* the EPA in 1999 regarding an investigation into a different wood-treatment site than the Avoca Plant. *See* J.A. 154-55 ¶¶ 37-39.

the aspect of the District Court order that required dismissal *with prejudice*. *See infra*, at 59-62. For now, it suffices to note that the District Court did not conclude that any such claims, to the extent they exist and had been pleaded, would be barred by the Injunction, and we agree that they would not without expressing any view as to the merits of such claim. At bottom, New Kerr-McGee could not have engaged in torts prior to its existence, and the Avoca Plaintiffs have not put forth facts supporting a claim that New Kerr-McGee breached a duty to them after it came into existence.

Thus, the only claims the Avoca Plaintiffs assert are through alter-ego/veil-piercing theories that seek to impute the acts of the polluters to New Kerr-McGee. Indeed, the Avoca Plaintiffs tellingly summarize their state-court complaints to allege that "New [Kerr-McGee] is responsible for the acts of its subsidiary, which operated the plant," and "further allege *direct* liability of [Old Kerr-McGee], which at the time was the parent company, for actions it took on its own." Appellants' Br. 9. Put another way, having conceded that they no longer intend to bring claims against the released Tronox debtors, the Plaintiffs admit that their sole claims against New Kerr-McGee are premised indirectly on the liability of those debtors.

This is where it gets tricky. As we see it, there are two species of claims against New Kerr-McGee. The first, "Fraudulent-Transfer Actions," are indirect-liability claims alleging that New Kerr-McGee mismanaged and undercapitalized Old Kerr-McGee and Kerr-McGee Chemical (ultimately, the Tronox debtors) such that they

44

were left with insufficient assets to pay creditors after entering bankruptcy. *See* J.A. 242-43.

The second, "Personal Injury Actions," comprises indirect-liability claims that seek to hold New Kerr-McGee liable for the tortious acts of its former indirect subsidiaries in operating the Avoca Plant. *See* Appellants' Br. 31-32 ("The claims [against New Kerr-McGee] are related to actions that Old [Kerr-McGee] took at the Avoca plant that relate directly and specifically to the Avoca Plaintiffs and only the Avoca Plaintiffs."). This is the heart of the Avoca Plaintiffs' case.

The Fraudulent-Transfer Actions are easy: they are the paradigmatic example of claims general to all creditors and are therefore barred by the Injunction for the reasons stated by the District Court. *See In re Tronox Inc.*, 549 B.R. at 53 ("[C]laims based on allegations such as these—a general failure to adhere to corporate formalities and abuse of the corporate form—are equally capable of increasing the basket of assets that could be used to satisfy any and all liabilities owed by the Tronox debtors.").

The Personal Injury Actions are tougher. The Avoca Plaintiffs attempt to particularize the Personal Injury Actions against New Kerr-McGee by personalizing the harm. But the Avoca Plaintiffs cannot and do not trace their harm to New Kerr-McGee. If they did, their claims would be particularized. Instead, the alleged liability of New Kerr-McGee arises not from its own conduct, but from its alleged existence as the alter ego and successor to the liabilities of the former parent of the actual alleged tortfeasor, Kerr-

45

McGee Chemical.[27] The harm they allege to have suffered at the hands of the latter is specific to them, but the harm they allege to have suffered at the hands of New Kerr-McGee is the same harm general to all Tronox creditors.

The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets. *See Koch Ref. v. Farmers Union Cent. Exch.*,

---

[27] Proving these claims against New Kerr-McGee requires establishing a chain of liability from the original tortfeasors to New Kerr-McGee. The Avoca Plaintiffs would first need a finding that the operator of the Avoca Plant, Tronox LLC (f/k/a Kerr-McGee Chemical) was liable for the underlying torts. Then they would need two veil-piercings or findings of alter-ego liability—the first to get to Tronox Worldwide LLC (f/k/a Old Kerr-McGee), the former direct parent of Tronox LLC, and the second to get to New Kerr-McGee as the non-debtor ultimate parent. At each level of piercing, the Avoca Plaintiffs would have to show that "there is fraud" or the entity whose veil they seek to pierce was "a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)); *see also Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio LLC*, 846 A.2d 1264, 1278 & n.9 (Pa. Super. Ct. 2004) ("Under [the alter-ego] theory, piercing the corporate veil applies when 'two or more corporations share common ownership and are, in reality, operating as a corporate combine.'" (quoting *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998))).

*Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987) ("[H]istorically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another." (alteration in original) (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210 (1945)). That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property. Instead, the trustee is conferred the right to recover for derivative, generalized claims; only the estate is charged with ensuring equitable distribution of estate assets and preventing individual creditors from pursuing their own interests and thus diminishing the res available to the rest of the creditors. Even more, it encourages, as it did here, orderly settlements—an interest not taken lightly. *See In re PaineWebber Ltd. P'ship Litig.*, 147 F.3d 132, 138 (2d Cir. 1998) (recognizing a "strong judicial policy in favor of settlements").

The critical distinction between the underlying tort claim against the Tronox debtors and the alter-ego claim against New Kerr-McGee is that establishing the former would benefit only the Avoca Plaintiffs as individual creditors, whereas establishing the latter—that New Kerr-McGee is the alter ego of the relevant Tronox debtors and should therefore be charged with all its liabilities—would benefit all creditors of the Tronox debtors generally. *See Emoral*, 740 F.3d at 880. The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the Avoca Plaintiffs, but the facts necessary to impute that liability to New Kerr-McGee "would be . . . generally available to any creditor, and recovery would

47

serve to increase the pool of assets available to all creditors." *See id.* at 881.

The Avoca Plaintiffs' tactics prove the point. They seek to use Judge Gropper's findings against New Kerr-McGee in the adversary proceeding—which involved generalized claims for fraudulent conveyance—in their state action. If those generalized findings would benefit their individual-creditors case, then their claims are no less generalized than the fraudulent-conveyance claims in the Adversary Proceeding.

For those reasons, the District Court correctly classified the Avoca Plaintiffs' claims as generalized, derivative claims comprising estate property.

### B. The Claims Are "Trust Derivative" or "Duplicative" and Thus Barred by the Injunction

Concluding that the claims are derivative and therefore properly within the jurisdiction of the bankruptcy court solves only part of the puzzle. The parties argue over the specific coverage of the Injunction and whether it means all "derivative claims" or something less. As noted above, we owe deference to the District Court's interpretation of "Trust Derivative Claims," considering the merits only to determine whether the District Court's obviously misinterpreted the Injunction to cover all claims within the jurisdiction of the bankruptcy court.

Applying that standard, we conclude that the District Court's order interpreted, but did not modify, the Injunction. We construe terms of an injunction according to

48

the general interpretive principles of contract law. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 103 (2d Cir. 2006). Here, we must interpret the terms of the Settlement Agreement, which defines certain pertinent terms used in the Injunction, in accordance with New York law. New York law requires us to interpret the Settlement Agreement "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)).

### i.     *What the Injunction Says*

The Injunction (set forth at Appendix B along with other relevant provisions of documents cross-referenced therein), read in conjunction with the Settlement Agreement, the confirmed bankruptcy plan, and trust documents, provides as follows: The Injunction bars the Tronox Debtors' creditors from asserting against any "Anadarko Released Party" any "Trust Derivative Claims" or any claims that are duplicative of "Trust Derivative Claims," "whether or not held or controlled by the Litigation Trust, or whether or not the Litigation Trust could have asserted such claims against any Anadarko Released Party." J.A. 224.[28]

---

[28] As noted above, the Avoca Plaintiffs do not dispute that they were creditors of Tronox or that New Kerr-McGee qualifies as an "Anadarko Released Party." J.A. 89 ¶ 1.9.

The Injunction mirrors the *Madoff* injunction, but goes further to define what claims those terms cover. *Compare Madoff*, 740 F.3d at 87 (noting that the injunction bars "any claim . . . that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee" (emphasis omitted)), *with* J.A. 97-98 (spelling out what the terms encompass). To wit, the Settlement Agreement defines "Trust Derivative Claims" as any claims the Anadarko Litigation Trust asserted or could have asserted "seeking relief or recovery *arising from harm to any Debtor or any Debtor's estate*, based on any legal theory." J.A. 97 ¶ 1.82 (emphasis added). It then goes on to list a variety of claims and theories that "Trust Derivative Claims" include—namely, claims relating to New Kerr-McGee's relationship with Tronox debtors, and "claims and/or remedies" alleging "agency, joint venture, alter ego, corporate veil piercing," and "successor liability." J.A. 97-98 ¶ 1.82.

The Injunction also clarifies the meaning of "duplicative claims." It explains that claims can be duplicative "*whether or not* held or controlled by the Litigation Trust" and "*whether or not* the Litigation Trust could have asserted" them. J.A. 224 (emphases added). These are, in other words, claims that substantially overlap, but are not identical to, "Trust Derivative Claims." *See, e.g., Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 473-75, 481-82 (S.D.N.Y. 2012) (holding that creditors' claims for conversion and unjust enrichment, among others, were duplicative of trustee's fraudulent-transfer claims), *aff'd* 740 F.3d 81 (2d Cir. 2014). Finally, the Injunction specifies the

50

claims it does not cover—namely, claims alleging liability that New Kerr-McGee "might have that does not arise *from or through* a liability of a Debtor." J.A. 224 (emphasis added).

These provisions provide the primary sources of contention. Aside from the now-rejected contention that their claims are not truly "derivative," Appellants' Br. 29-34, the Avoca Plaintiffs argue:

(1) The District Court erred when it determined that the "Anadarko Litigation Trust Agreement gave the Litigation Trust the power to institute any other actions that could have been brought by Tronox against [New Kerr-McGee]," Appellants' Br. 19-24;

(2) Their claims do not "arise from harm to" the Tronox debtors or their estates, Appellants' Br. 24-29; and

(3) The court could not prohibit them from filing other claims against New Kerr-McGee, and thus erred in ordering them to dismiss the PA State Action with prejudice, *see* Appellants' Br. 34-45.

None has merit.

### ii. *The Litigation Trust Had Power to Assert the Claims*

The Avoca Plaintiffs also argue that the District Court misread the trust documents to mean that the Litigation Trust had authority over derivative claims like theirs that

51

had not yet been asserted in the Adversary Proceeding. They point to a footnote set forth in the margin[29] in which the District Court explained that its conclusion that personal injury claims can be derivative was "buttressed" by certain bankruptcy documents and the proceedings themselves.

The Avoca Plaintiffs, however, exaggerate the import of that footnote and read some of the trust documents too

---

[29] The footnote reads:

> This understanding is buttressed by the proceedings and litigation history that led to this Court's entry of the Injunction. In particular, the Court's view is informed by the nature and scope of the Adversary Proceeding and the Settlement Agreement. The Adversary Proceeding (and the resulting Settlement Agreement) encompassed any and all claims that the Tronox trustee could pursue against [New Kerr-McGee]. The Adversary Proceeding was brought by the Tronox estate (and then continued by the Anadarko Litigation Trust) to recover funds transferred to [New Kerr-McGee]. through fraudulent intra-corporate shenanigans. The Anadarko Litigation Trust Agreement gave the Litigation Trust the power to institute any other actions that could have been brought by Tronox against [New Kerr-McGee]. Thus, any claims that could be asserted by the Tronox trustee against the defendants in the Adversary Proceeding may properly fall within the scope of the Settlement Agreement and the Injunction.

*In re Tronox Inc.*, 549 B.R. at 52 n.21 (citation omitted).

narrowly, rendering other language superfluous and generally making no sense. More importantly, for the reasons that follow, they are wrong—the Litigation Trust had authority over pleaded and unpleaded claims.[30]

The confirmed bankruptcy plan states that, pursuant to the Litigation Trust Agreement, the Tronox debtors would transfer to the Litigation Trust their "rights" to the Adversary Proceeding. J.A. 49. The Litigation Trust Agreement "irrevocably and absolutely" transferred all of the debtors' "rights, title, and interests (whether legal, beneficial, or otherwise) to the Anadarko Litigation, *including* any and all claims therein." J.A. 452 (emphasis added).

New Kerr-McGee argues that this language means that the agreement transferred more than pending claims. It asserts that the word "including" suggests that the "claims therein" were only some of the rights and interests transferred to the trust—other rights were derivative claims like the Avoca Plaintiffs' claims that the debtors had not specifically pleaded, as well as the procedural right to amend the adversary proceeding complaint to include such claims. In the absence of the other contextual documents, New Kerr-McGee's construction of the "including" clause would be a stretch—one of multiple interpretations of equivocal language. Indeed, that language could just as easily be read to mean that the Tronox debtors were

---

[30] This is essentially a collateral attack on the Litigation Trust's authority, which could have been, but was not, brought at the time the Injunction was issued.

transferring all claims then asserted. But taking the documents together and applying a little common sense confirms their view.

As an initial matter, the very definition of "Trust Derivative Claims" lists a host of causes of actions that were not pleaded in the adversary-proceeding complaint. If the Avoca Plaintiffs were right, then almost none of the claims the Injunction purports to enjoin would actually be enjoined because the trustee had not yet pleaded them in the adversary proceeding. That makes little sense.

Moreover, the bankruptcy court's confirmation order twice states that the Tronox debtors transferred their rights to the claims pending in the adversary proceeding "and any claim or cause of action of Tronox related thereto." Suppl. App. 53 ¶ 126, 55 ¶ 131. Those pending and not-yet-asserted derivative claims went to the Litigation Trust. Likewise, the Litigation Trust was empowered to "institute or continue actions which were or otherwise could have been brought by any Debtor that constitute Trust Property." J.A. 456. If the Avoca Plaintiffs were right that "Trust Property" included only then-asserted claims, the Litigation Trust would not need, and would in fact lack power, to "institute" actions that "otherwise *could have been brought by any Debtor.*" *Id.* (emphasis added).

Finally, contemplating that others might challenge the Litigation Trust's authority, the Injunction specifically barred duplicative claims—enjoining claims "whether or not held or controlled by the Litigation Trust, or whether or

not the Litigation Trust could have asserted such claims."[31] J.A. 224. The District Court correctly interpreted the Injunction to cover claims beyond those asserted in the Adversary Proceeding.

---

[31] The Avoca Plaintiffs also argue that barring the claims violates the expectations of the parties to the settlement, because, through the Tort Claims Trust and its Advisory Committee, they explicitly rejected Anadarko and New Kerr-McGee's request for a broad release as to them as part of a settlement of the Adversary Proceeding. But, as the District Court explained, "[a] belief that claims are retained is trumped by contractual language that clearly states they are not." *In re Tronox Inc.*, 549 B.R. at 54 (citing *Mastrovincenzo*, 435 F.3d at 103). Moreover, this highlights a subtext to this whole case: it would be curious for New Kerr-McGee to have settled these claims without insulating themselves from additional litigation with the individual creditors, and if the Avoca Plaintiffs were able to pursue these claims based on the same allegations set forth in their proofs of claim in the Tronox bankruptcy, then for what harm were they entitled to the original recovery?

The Avoca Plaintiffs further argue that New Kerr-McGee waived its right to contest its responsibility for policies at the Avoca Plant because it did not argue in the PA State Action that it was the wrong party in the years of litigation that preceded the Tronox bankruptcy. But New Kerr-McGee's behavior before the release of claims against the Tronox debtors does not indicate how New Kerr-McGee would have operated after the Injunction issued and it was the sole remaining defendant. *See* J.A. 751.

55

### iii. *The Claims "Arise from Harm" to the Debtors*

The Avoca Plaintiffs take issue with the District Court's interpretation of the definition of "Trust Derivative Claims," arguing that their claims fall outside the definition because they "seek redress for harms *to the Avoca Plaintiffs*," rather than "relief from harm *to Tronox or the Tronox bankruptcy estate.*" Appellants' Br. 17 (emphases added). Their reading is too cute, and fails for the same reason that the claims are derivative: any creditor's claim is for harm to itself, but the point of the Injunction was to bar claims that were brought or could have been brought in the Adversary Proceeding, and those claims arise from harm to the Tronox debtors. At bottom, the Avoca Plaintiffs' claims are that certain Tronox debtors harmed them, and that New Kerr-McGee harmed the Tronox debtors. In that sense, "the Avoca Plaintiffs' indirect-liability claims against New Kerr-McGee arise from two alleged harms—from harm to them and from harm to the Tronox debtors." Appellees' Br. 32.

Further, *Madoff* is a hurdle that the Avoca Plaintiffs' have failed to overcome. There, too, we confronted the same "arise[] from harm done to the estate" language and deemed it to mean derivative claims. 740 F.3d at 89 (alteration in original). The Avoca Plaintiffs' attempts to distinguish this case from *Madoff* are unpersuasive. First, they argue that the *Madoff* injunction was broader than this Injunction because the *Madoff* trustee had greater authority than the Litigation Trust here. Even if that were true, the Avoca Plaintiffs are bound by the Injunction's language, to which they did not object. Second, they argue the two

injunctions are different because the Injunction here bars "Trust Derivative Claims," whereas the *Madoff* injunction excluded the word "Trust" and barred only "derivative claims." The addition of the word "Trust," however, does not render the two Injunctions materially different. Rather, it is the definitions and not the titles which we compare, and those do not materially differ. **A219-20.**

Finally, the District Court noted—and New Kerr-McGee asserts here—that because the Injunction does not bar any liability that such released parties "might have that *does not* arise from or through a liability of a Debtor," the Injunction must bar claims that *do* arise from or through a liability of a Debtor. Just because the Injunction does not bar claims that do not arise from or through debtor liability does not mean that a harm that *does* arise from or through a liability of a debtor is necessarily barred; the claim still must be trust-derivative or -duplicative. That said, the inclusion of that language supports the notion that the Injunction was meant to bar all derivative or duplicative claims, nothing more. In other words, by providing that the Injunction does not bar any liability that such released parties "might have that *does not* arise from or through a liability of a Debtor," the Injunction was making clear that it covered derivative claims and did not cover non-derivative claims. Read against the backdrop of decades of derivative-claim jurisprudence, the language makes sense; it specifically avoids the appearance of a *Manville III* problem, where the Injunction could appear to go beyond the jurisdiction of the bankruptcy court. *See Manville III*, 517

F.3d at 65 (holding that the bankruptcy court lacked jurisdiction to enjoin claims against third-party insurer).

The same was true in *Madoff.* Indeed, in issuing the Injunction, the District Court noted that, in *Madoff*, this Court "upheld a permanent injunction that, like the one at issue here, was 'limited to third-party claims based on derivative or duplicative liability or claims that could have been brought by the Trustee against the . . . releasees.'" *Anadarko*, 2014 WL 5825308, at *10 (quoting *Madoff*, 740 F.3d at 89, 95). In making that pronouncement in *Madoff*, we held that the bankruptcy court did not exceed its jurisdiction in issuing the injunction. 740 F.3d at 89. The Injunction here does the same: it goes to the limit of the bankruptcy court's jurisdiction to bar derivative or duplicative claims, but no further.

For those reasons, the District Court acted well within its discretion in interpreting the language of the settlement when it found that the Avoca Plaintiffs' claims were barred by the Injunction. The District Court therefore did not expand the scope of the Injunction, and thus did not modify it.

The Avoca Plaintiffs had an opportunity to seek recovery from the Tronox debtors in the bankruptcy proceeding, to participate in settlement negotiations, and to object to the Settlement Agreement and Injunction (and refuse recovery therefrom). Indeed, as PepsiCo did in *St. Paul*, the Avoca Plaintiffs, as unsecured creditors of the Tronox debtors, filed claims in the bankruptcy court against the debtors, were represented by the Litigation Trust, and

58

had a voice through which to articulate their claims. *See St. Paul*, 884 F.2d at 705. That voice sought assets from New Kerr-McGee in the Adversary Proceeding and settled those claims for a significant sum, from which the Avoca Plaintiffs recovered. The Avoca Plaintiffs cannot now get a second bite at the apple.

## C. The District Court's Order to Dismiss the PA State Action With Prejudice Was Not an Abuse of Discretion

The Avoca Plaintiffs argue that, even if their already-pleaded claims are barred as derivative, the District Court should have allowed them to amend their state-court complaints, and that by ordering them to dismiss with prejudice the District Court exceeded its jurisdiction and violated *Madoff.* Appellants' Br. 43-45. They are wrong.

The District court "plainly had jurisdiction to interpret and enforce its own prior order[] [the Injunction]" which it "explicitly retained jurisdiction to enforce." *See Travelers Indem.*, 557 U.S. at 151. The court's choice of how to enforce the order is reviewed for abuse of discretion. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 595 (2d Cir. 1991). A court can take "any reasonable action . . . to secure compliance," and the "scope of a district court's equitable powers to remedy past wrongs is broad." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Gates v. Collier*, 616 F.2d 1268, 1271 (5th Cir. 1980)).

The District Court held that all claims already pleaded were barred by the Injunction, and that, despite ample opportunities to do so, the Avoca Plaintiffs had failed to come up with a claim that would not be barred. *Madoff* does not require a district court to allow countless attempts to replead. At the point when we determined that there was "conceivably some particularized conspiracy claim," *Madoff*, 740 F.3d at 94, the lower courts had considered only whether specific claims in a filed complaint were barred, *see id.* at 87-88. The bankruptcy court and district court had not yet had the opportunity to consider what other claims, if any, were enjoined. That is why we left the issue of whether alternative, unpleaded claims might qualify as non-derivative for the District Court to consider in the first instance. *Id.* at 94. *Madoff* should not be read beyond its facts and posture as an invitation for plaintiffs to limitlessly re-plead theories to circumvent the reach of an injunction.

The Avoca Plaintiffs have had more than enough time and opportunities—in state court, the District Court, and in this Court—to articulate a claim that is not derivative. They have failed. Their briefs here and below have never mentioned any "particularized conspiracy claim" or other type of direct claim against New Kerr-McGee. To date, they have only ever asserted that "they suffered personal injuries as a direct result of the conduct of [Old Kerr-McGee]." Appellants' Br. 41. As mentioned above, counsel for the Avoca Plaintiffs argued for the first time at oral argument that direct claims might exist based on a purported letter to the EPA saying that New Kerr-

McGee would be handling the remediation. But even then counsel failed to articulate what the claim would be.

Lest the reader think the Avoca Plaintiffs were deprived of sufficient opportunities to conceive a direct claim, the Avoca Plaintiffs filed a post-argument Federal Rule of Appellate Procedure 28(j) letter to supplement their challenge to the District Court's determination that they had no direct claims. In it, they articulate no direct claim, but argue only that Judge Forrest's determination that they lacked any *bona fide* direct claims against New Kerr-McGee violated the historical admonition against advisory opinions recently reiterated in *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016). Unlike the bankruptcy court decision in *In re Motors*, which resolved an issue not before it and involved an entity not party to the litigation, *id.* at 150-52, Judge Forrest's opinion was not advisory. As explained above, she had jurisdiction to interpret and apply the Injunction, *see Travelers Indem.*, 557 U.S. at 151, and to take any reasonable action to secure compliance therewith, *see Berger*, 771 F.2d at 1568.

The frailty of the Avoca Plaintiffs' position is confirmed by the last sentence of their merits Reply Brief:

> The Avoca Plaintiffs contend, however, that equity requires that the Court permit them to return to the [Pennsylvania state court] to obtain information in discovery that New [Kerr-McGee] should have provided previously, and that the Court

61

> permit them to continue with the "slice" of
> their claims that remain[s].

Appellants' Reply Br. 23. Of course they have not yet had discovery in state court, but that is not how claims are pleaded—plaintiffs do not get to file a complaint hoping that discovery will yield facts to give rise to claims that are not barred. Concerned about continued gamesmanship, the District Court acted within its discretion when it ordered the Avoca Plaintiffs to dismiss with prejudice.[32] But more importantly, Judge Forrest did not modify the Injunction in doing so. We therefore lack jurisdiction.

## CONCLUSION

For the foregoing reasons, the stay is hereby lifted and the appeal is **DISMISSED** for lack of jurisdiction.

---

[32] The Avoca Plaintiffs finally argue that the issue of whether the claims are extinguished by the Settlement Agreement—the purported "alternative holding" that New Kerr-McGee urges as a fallback—is an issue that ought to be resolved by the state court on any claims that survive the Injunction. But because no claims survive the Injunction, and there are none that can be properly pleaded by amendment, the issue of whether the claims have been extinguished is of no moment. In any event, because we dismiss for want of appellate jurisdiction, the propriety of the extinguishment ruling may conceivably be litigated at a later date on appeal from a contempt ruling or otherwise.

# APPENDIX A



# APPENDIX B

## Relevant Portions of the Injunction and the Settlement Agreement

### THE INJUNCTION

(i) [A]ny Debtor(s), (ii) any creditor of any Debtor who filed or could have filed a claim in the Chapter 11 Cases, (iii) any other Person whose claim (A) in any way arises form or is related to the Adversary Proceeding, (B) is a Trust Derivative Claim, or (C) is duplicative of a Trust Derivative Claim, and (iv) any Person acting or purporting to act as an attorney for any of the preceding *is hereby permanently enjoined from asserting against any Anadarko Released Party* (I) any Trust Derivative Claims or (II) any claims that are duplicative of Trust Derivative Claims, whether or not held or controlled by the Litigation Trust, or whether or not the Litigation Trust could have asserted such claims against any Anadarko Released Party.

The injunction herein shall not apply to or bar [eight classes of claims, including] . . . (v) any liability that an Anadarko Released Party might have that does not arise from or through a liability of a Debtor . . . .

*Anadarko*, 2014 WL 5825308, at *10 (emphasis added); *see also* J.A. 223-24.

64

# SETTLEMENT AGREEMENT

**Adversary Proceeding:** [T]he adversary proceeding pending in the Bankruptcy Court . . ., including the claims asserted in the Second Amended Adversary Complaint, all claims and /or remedies that a Debtor transferred to the Litigation Trust that were asserted or could have been asserted in this adversary proceeding, and the claims asserted in the Complaint-in-Intervention and that could have been asserted in the Complaint-in-Intervention relating to the subject matter of this adversary proceeding. J.A. 88 ¶ 1.2.

**Anadarko Released Party:** Anadarko and each of its Affiliates [including New Kerr-McGee], and each of their respective predecessors, successors, and assigns, all of their past, present, and future officers, directors, employees, managers, members, agents, attorneys and other representatives. J.A. 89 ¶ 1.9.

**Trust Derivative Claim:** [A]ny and all claims and/or remedies that are held and/or controlled by, and which were or could have been asserted by, the Litigation Trust against any Anadarko Released Party, seeking relief or recovery arising from harm to any Debtor or any Debtor's estate, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the Adversary Proceeding; (ii) the Chapter 11 Cases; (iii) the Bankruptcy

65

Claims; (iv) the Covered Sites; and/or (v) any Anadarko Released Party's ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time as a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with a Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including Unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmetered, foreseen or unforeseen, accrued or unaccrued, past, present or future for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, . . . successor liability, . . . and all other such claims and/or remedies. J.A. 97-98 ¶ 1.82.